Brent H. Blakely (SBN 157292)
bblakely@blakelylawgroup.com
Tara A. Currie (SBN 323984)
tcurrie@blakelylawgroup.com
**BLAKELY LAW GROUP**
1334 Parkview Avenue, Suite 280
Manhattan Beach, California 90266
Telephone: (310) 546-7400
Facsimile: (310) 546-7401

*Attorneys for Plaintiff*
*Greater Oceans, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREATER OCEANS, INC., a California Corporation, <br><br> Plaintiff, <br><br> v. <br><br> ERIC THORSTENSON, an individual; and DOES 1-10, inclusive, <br><br> Defendants. | CASE NO.: 2:20-cv-11340-MEMF-PLA <br><br> **SECOND AMENDED COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES, EQUITABLE RELIEF:** <br><br> 1. **MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT**, 18 U.S.C. § 1836 *et seq.* <br><br> 2. **CONVERSION** <br><br> 3. **BREACH OF ORAL CONTRACT** <br><br> 4. **BREACH OF WRITTEN CONTRACT** <br><br> 5. **BREACH OF THE DUTY OF LOYALTY** <br><br> 6. **BREACH OF FIDUCIARY DUTY** <br><br> 7. **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS** <br><br> 8. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br><br> 9. **UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE, § 17200 *et seq.*** <br><br> 10. **DECLARATORY JUDGMENT UNDER CAL. CODE CIV. PROC.** |

§ 1060

)
)
)

**JURY TRIAL DEMANDED**

Plaintiff Greater Oceans, Inc. d/b/a/ Third Eye ("Greater Oceans" or "Plaintiff") for its Second Amended Complaint against Defendants Eric Thorstenson ("Thorstenson") and DOES 1-10 (collectively "Defendants") alleges as follows:

## THE PARTIES

1.      Greater Oceans is a corporation duly organized and existing under the laws of the State of California, with an office and principal place of business located at 33061 Santiago Drive, Dana Point, California 92629.

2.      Upon information and belief, Thorstenson is an individual residing at 5648 Hamill Ave, San Diego, California 92120.

3.      Upon information and belief, together with Thorstenson, other individuals and entities currently named as DOES 1-10 are responsible for one or more of the wrongful acts or omissions giving rise to the claims alleged herein, and that at all relevant times, Thorstenson and each one of DOES 1-10 served as an agent of the others and were acting within the course and scope of said agency.  These other individuals and entities are fictiously named DOES 1-10 because their true names and capacities are currently unknown, but Plaintiff will amend this Complaint upon ascertaining the true names and capacities of DOES 1-10.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Greater Oceans' claims pursuant to 28 U.S.C. § 1331 and the trade secret laws of the United States, 18 U.S.C. § 1836 and 1839 *et seq*., and the Court possesses supplemental jurisdiction over Greater Oceans' state law claims under 28 U.S.C. § 1367(a) because Greater Oceans' federal and state law claims derive from a common nucleus of operative fact.

5.      This Court has personal jurisdiction over all Defendants because the acts or omissions giving rise to Greater Oceans' claims, including but not limited to the misappropriation of Greater Oceans' trade secret information and breach of contract,

occurred in California. The Parties also agreed to jurisdiction in state or federal courts of California under the contracts at issue.  This Court also has personal jurisdiction over Thorstenson on the grounds that during the acts or omissions giving rise to Greater Oceans' claims, Thorstenson resided in California.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to Greater Oceans' claims occurred in this judicial district.  Furthermore, the Parties expressly agreed that "[t]he exclusive jurisdiction for any legal proceeding regarding [the contract at issue] shall be in the state or federal courts of Orange County, California, and the parties expressly agree that jurisdiction and venue are proper in said courts."

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.    Jeff Hornbaker's Notoriety and Third Eye's Beginnings

7.    The story of Greater Oceans begins with its founder Jeff Hornbaker ("Hornbaker")[1], one of the most recognized names in the world of water sports, surfing, and fashion lifestyles. Hornbaker is one of the most published and renowned surf and ocean photographers in the world. For over 38 years, Hornbaker has shaped the creative direction of surf brands such as Roxy, Rip Curl, OP, O'Neill, and Arnett, including over 25 years of exclusive consulting work for Quiksilver, Inc. ("Quiksilver"), the largest surf apparel and water/board sports company in the world by revenue. Hornbaker would consult Quiksilver in various areas, including but not limited to, brand management, products, designs, advertising, graphic art, and conceptual direction.

8.    Hornbaker's career trajectory was fitting for his avid surfing lifestyle. Hornbaker started surfing when he was 13 years old and continues to surf and partake in various water activities. This recreational experience, combined with his skilled photography, marketing strategies, branding, and creativity, allowed Hornbaker to

---

[1] Last names are used for ease of reference for both parties.

1  transform Quiksilver from its humble beginnings to a multi-million dollar company
2  during his time there.

3      9.    Hornbaker established lasting business relationships with key players in
4  the surfing/ocean industry throughout his career, including but not limited to, Bob
5  McKnight, Quiksilver's co-founder. He is now on a first-name basis with many surf
6  and ocean legends. Hornbaker has worked with various major brands in the surf
7  industry for the past 40 years, leading to a global revolution in ocean lifestyle.

8      10.   In the mid-1990s, Hornbaker created Third Eye, which at that time, was
9  primarily used in connection with clothing and Hornbaker's film and photography
10 work. In 1996, Hornbaker collaborated with Quiksilver to release a signature line of
11 Third Eye apparel.  For approximately three years, Quiksilver sold the product in
12 retail stores all over the United States and abroad with a resounding success.  In the
13 film arena, Hornbaker produced and marketed several films under the Third Eye
14 brand, and has collaborated and filmed in numerous productions both commercial and
15 theatrically worldwide. As a result, the Third Eye brand and name is well known in
16 the surf/ocean industry.

17    **B.    Hornbaker and Thorstenson's Greater Oceans DBA Third Eye**

18      11.   Starting in or around 2015, Quiksilver began exploring an idea for a new
19 safety product—later named the "Airlift" inflatable vest—that, when activated,
20 inflates to bring the consumer to the ocean surface even in the most intense ocean
21 conditions and largest waves.[2] The final Airlift vest on the market today was
22 developed by Quiksilver in collaboration with Aqua Lung, a manufacturer of scuba
23 and diving equipment.  Hornbaker was responsible for developing marketing materials
24 for the Airlift vest.

25      12.   While working on photography and marketing materials for the Airlift

26

27    _____

28 [2] Additional details, pictures, and videos of the Airlift vest are available on
   Quiksilver's website at www.quiksilver.com/highline-pro-airlift-vest/

vest, Hornbaker began discussing various ideas he had for new water safety products with Thorstenson. After bouncing ideas back-and-forth, Hornbaker and Thorstenson also discussed the possibility of starting a new business venture in order to develop and market a new water safety platform as well as other surf and apnea diving-related products.

13.     In or around May 2019, Hornbaker and Thorstenson decided to move forward with the new business venture, Greater Oceans DBA Third Eye, to develop and market the new water safety platform, as well as other products. Hornbaker would contribute his decades of experience and business/retail contacts in the surf/ocean industry, his reputation and fame (including that associated with the Third Eye brand over the years), creative talents, branding concepts, and product ideas to Greater Oceans. Thorstenson would contribute his engineering and technical background to help bring certain concepts and products to life, including certain manufacturing contacts. Around that same time, Thorstenson's ex-wife filed for divorce.

14.     Although they had initially contemplated forming Greater Oceans as a partnership, Thorstenson indicated to Hornbaker and others on several occasions that he did not want his wife to have any claim to the business.  For example, on June 4, 2019, Thorstenson sent an email to his personal divorce attorney and Greater Oceans in which he expressly states his desire "for keeping my future EX-wife Lynne 100% out of our new Third Eye business start up." Whether motivated by his divorce or simply because he lacked capital to contribute, Thorstenson insisted on being paid by Greater Oceans as an independent consultant in lieu of equity.

15.     Upon information and belief, on or about April 23, 2019, Thorstenson left his position with Aqua Lung due to workplace harassment. Upon information and belief, after his departure, Thorstenson received several threatening letters from Aqua Lung claiming that he violated trade secrets of the company.

16.     In the meantime, Greater Oceans was discussing the production of an inflatable safety vest with Capewell Aerial Systems LLC ("Capewell"). Hornbaker

had developed ideas for certain features of the vest which improved upon the Airlift vest launched by Quiksilver. The features that Hornbaker had developed for Greater Oceans' safety vest were a result of his knowledge and experience for a need in the industry for a vest that had these features. From decades of surfing and participating in water activities himself, conducting interviews with consumers who have worn similar safety vests, and receiving feedback from his contacts at Quiksilver, Hornbaker learned that these features would be extremely attractive and marketable to consumers. In fact, Quiksilver told Hornbaker that it would help sell Greater Oceans' safety vest product in its retail stores nationwide once completed and gave Greater Oceans permission to build upon its Airlift vest. The safety vest features, marketing and sale strategies related thereto, and other technical and confidential contributions by Thorstenson constituted one of Greater Oceans' confidential trade secrets ("Vest Trade Secrets"). The Vest Trade Secrets were not generally known to the public and if disclosed, would be advantageous to a competitor as there was no other vest on the market that had these features.

17. Hornbaker identified to Thorstenson the Vest Trade Secrets and instructed him not to disclose or use these trade secrets unless otherwise noted. Because of Hornbaker's background in photography, Hornbaker understood that protecting one's copyrights and other intellectual property was important.

18. As a result, when Capewell presented Greater Oceans with the draft Independent Consultant Agreement related to the safety vest, Hornbaker requested that the confidentiality provision be modified to mutually protect the parties' information and trade secrets, including the Vest Trade Secrets, and also explained the importance of these terms to Thorstenson.

19. On May 3, 2019, Capewell and Greater Oceans executed the Independent Consultant Agreement, a true and correct copy of which is attached as **Exhibit A**. In pertinent part, the confidentiality section identified as "Confidential Information": "*various trade secrets and confidential information . . . including without limitation,*

*financial, operational and development information, employee data, vendor, client and supplier information, designs, intellectual property, technical information, samples and prototypes, products and services*".  It also read: "*The receiving party shall hold in strict confidence and not disclose any of the disclosing party's Confidential Information, directly or indirectly, nor use the disclosing party's Confidential Information in any way.*" Exh. A.

20.    Going forward, Hornbaker reiterated to Thorstenson the importance of keeping the Vest Trade Secrets confidential, information similar to that addressed in the Capewell agreement confidential, and other products and related trade secrets described herein confidential, and not to disclose the same to any unauthorized third party. The parties agreed that all such information were owned by Greater Oceans.

21.    In furtherance of maintaining such confidentiality, Greater Oceans created a separate e-mail domain where Thorstenson, Hornbaker, and Greater Oceans' secretary Virginie maintained password-protected accounts not known to third parties. Greater Oceans also kept documents related to its trade secrets described herein, including the Vest Trade Secrets, on a secure computer server and limited access from unauthorized third parties to this information. As further detailed in this complaint, Greater Oceans, especially with respect to Hornbaker, advised its business partners, vendors, suppliers, manufacturers, and other third parties described herein of the confidentiality of its trade secrets described herein, including the Vest Trade Secrets, whether via oral or written communication, on a need-to-know basis for producing, distributing, or selling the products related to those trade secrets. Many of Hornbaker's established business contacts understood that any information he shared with them regarding product concepts or ideas were confidential because that is how Hornbaker always operated.

22.    On July 9, 2019, Greater Oceans and Thorstenson reduced certain terms of their business relationship to writing by executing an Independent Consultant Agreement ("IC Agreement"), a true and correct copy of which is attached as **Exhibit**

**B**.  Although the face of the IC Agreement indicates an Effective Date of June 4, 2019, it was actually executed on or around July 9, 2019. Thorstenson insisted on backdating the IC Agreement for, upon information and belief, reasons related to his then-pending divorce. Exh. B.

23.    In  pertinent  part,  the  IC  Agreement  states  that  "*Consultant [Thorstenston] will provide services as an Independent Contractor to Client [Greater Oceans] for the development of certain products and services which will be solely owned by Client.*" Exh. B, ¶ 1. In the written correspondence supplementing the IC Agreement, it states "*[a]ll IP rights during the course of this consulting agreement will be the sole property of Greater Oceans Inc*." Exh. B, p. 2.

24.    Despite being told numerous times that the Vest Trade Secrets and similar information related to other products in development were confidential trade secrets  as  described  herein,  Hornbaker  on  several  occasions  had  to  remind Thorstenson to not disclose such trade secrets as he was found to be in constant violation.  For example, on August 15, 2019, Hornbaker emailed Thorstenson not to share  Greater  Oceans'  trade  secrets  and  to  stop  disclosing  such  confidential information because Thorstenson was in violation; Hornbaker and Virginie had told Thorstenson "over a hundred times" to keep such trade secrets and other business information confidential.

25.    In late August/early September 2019, Greater Oceans and Thorstenson entered into a more complete, but not perfect, "Consulting Agreement", a true and correct copy of which is attached as **Exhibit C**. The Parties executed the Consulting Agreement in late August or early September of 2019, rather than the date indicated on its face, May 28, 2019. Similar to the IC Agreement, the handwritten May 28, 2019 date was added by Thorstenson, who, upon information and belief, did so for the same reasons related to his then-pending divorce.

26.    Even though the Consulting Agreement provided for the Parties to enter into  a  separate  agreement  "*regarding  the  parties'  confidentiality  obligations*",

Thorstenson refused to sign the separate confidentiality agreement that was drafted at the same time as the Consulting Agreement. *See* Exh. C, ¶ 2. Despite his refusal to sign for whatever reason, Thorstenson knew that the trade secrets described herein, including the Vest Trade Secret, were confidential and not to be disclosed or used.

27.    In addition, even though the Consulting Agreement provided that the parties would enter into another agreement regarding Greater Oceans' inventions related to Thorstenson's services, Hornbaker and Thorstenson understood that Greater Oceans owned all intellectual property, including the trade secrets described herein, that was created before or during Thorstenson's employment relationship with Greater Oceans. *See* Exh. C, ¶ 2.

28.    From late 2019 to early 2020, Greater Oceans also worked with a supplier, Cathay Consolidated, Inc. ("Cathay") to manufacture Greater Oceans' safety vest for Capewell's distribution and other products, including a firm order for 22 "golden samples" (*i.e.*, production-ready) of the vest. Naturally, the Vest Trade Secrets were disclosed to Cathay and Greater Oceans identified that they were confidential trade secrets which were not to be disclosed to unauthorized third parties.

29.    Upon information and belief, beginning in January 2020, Thorstenson began to contact Greater Oceans' existing clients and vendors through his own personal email, and without Hornbaker's knowledge, regarding the products and trade secrets described herein.

30.    Beginning in approximately February 2020, Greater Oceans and Rock West Composites ("Rock West") began discussing the development of a prototype for a carbon fin blade project. As with the safety vest, Hornbaker developed an idea for a feature of a fin system which was reduced to a template that was eventually provided to Rock West for the carbon fins on a confidential basis. The features that Hornbaker had developed for Greater Oceans' carbon fins were a result of his knowledge and experience for a need in the industry for fins that had these features. From decades of surfing and participating in water activities himself and conducting extensive hands-

on research of a particular fish species, Hornbaker learned that these features would be extremely attractive and marketable to consumers. The fin features, marketing strategies related thereto, and other technical and confidential contributions by Thorstenson constituted one of Greater Oceans' confidential trade secrets ("Carbon Fin Trade Secrets"). The Carbon Fin Trade Secrets were not generally known to the public and if disclosed, would be advantageous to a competitor as there was no other fin on the market that had these features.

31.    During Greater Oceans' confidential "marine division" proposal to Rock West of the carbon fin blade system, Thorstenson revealed confidential information about the amphibious goggle and related trade secrets (as described below) when he had no authority to do so. The concepts related to the amphibious goggle were still being discussed and were not to be revealed to third parties other than QBAS at the time, as described below.

32.    On February 18, 2020, Greater Oceans and Thorstenson reduced some of their ownership and intellectual property assignment understandings to writing by executing an agreement titled "Intellectual Property Assignment" ("IP Agreement"), a true and correct copy of which is attached hereto as **Exhibit D**.  In pertinent part, the IP Agreement assigns "*the entire right, title and interest in the Invention,*" defined as "*all proprietary and intellectual property rights, including copyrights and patents, in the concepts and technologies known and described as the 'Inflatable Water Safety Harness With Load Bearing Structure,*'" and specifically "*all copyrights, **trade secrets**, and all patents which may be granted on the Invention*" from Thorstenson to Greater Oceans. Exh. D.

33.    Moreover, the IP Agreement assigned any contributions that Thorstenson made to the safety vest and technical know-how associated with the vest to Greater Oceans, which also made up part of the Vest Trade Secrets.

34.    Although the IP Agreement only addressed the safety vest, Hornbaker and Thorstenson remained of the understanding that Greater Oceans owned all

intellectual property, including the trade secrets described herein, that were created before or during Thorstenson's employment relationship with Greater Oceans.

35.     In approximately March 2020, at Capewell's request, Greater Oceans prepared a business proposal to develop and manufacture a new emergency breathing system (EBS) product exclusively for Capewell. This business proposal included trade secrets relating to the proprietary EBS product designs and technical know-how associated with its intellectual property (which was owned by Greater Oceans), Hornbaker's marketing strategies and business contacts established by Hornbaker over three decades of working within the industry (and as a result, knew that these contacts would be able to successfully bring the product to market), terms of Greater Oceans' exclusive contracts with its suppliers, vendors, partners, and customers, including customer pricing models, all related to the manufacture, distribution, and ultimate sale of the EBS product. This constituted the "EBS Trade Secrets" that Thorstenson knew he was not to disclose to any unauthorized third parties or use to his own advantage outside of the Greater Oceans' consulting relationship. The EBS Trade Secrets were not generally known to the public if disclosed, would be advantageous to a competitor as the information is sophisticated, commercially valuable and would allow a competitor to create a competing EBS product with little to no lead time and get it to market. Capewell was advised that the EBS product and EBS Trade Secrets were confidential, owned by Greater Oceans, and not to be disclosed or used without Greater Oceans' permission.

36.     In approximately March 2020, Greater Oceans and QBAS Co., Ltd ("QBAS") came to an agreement for manufacturing tooling and molds for a mask product, amphibious goggles, and a fin system developed by Greater Oceans. The agreement also included confidential payment terms exclusive to Greater Oceans. The mask was designed in collaboration with Hornbaker and his established business contact and renowned diver, and QBAS' designer. The amphibious goggles were designed and developed by Greater Oceans, and would become one of Greater

Oceans' flagship pieces for its uniqueness. The fin system is the same system from which the carbon fin system was derived, and thus was also a trade secret for the reasons described herein. The ideas, concepts, outlines, and marketing strategies relating to each of these three products were not generally known to the public and if disclosed, would be advantageous to a competitor as there were no other products on the market that had the features and designs that Greater Oceans developed. Such information and trade secrets were developed through significant research and effort in furtherance of Greater Oceans. Both QBAS and Thorstenson knew not to disclose or use these so-called Mask, Amphibious Goggles, and Fin System Trade Secrets without Greater Oceans' authorization as they were confidential and proprietary.

### C.   Thorstenson's Deceptive Acts and Termination

37.   Thorstenson's private and personal correspondence with Greater Oceans' business contacts, without Hornbaker's knowledge, rapidly increased in March and April 2020.  At this time, Greater Oceans was finalizing designs and had received commitments on proposals from various vendors, manufacturers, and customers described herein. In furtherance of the business and contractual relationships with those parties, Greater Oceans (and especially Hornbaker) and expended significant financial resources. For reasons unknown, Thorstenson began to act increasingly deceptive and sour toward Hornbaker during this time.

38.   On March 31, 2020, Greater Oceans had finalized its proposal of the EBS product to Capewell, which not only included the EBS Trade Secrets, but contained confidential information about a business relationship with a certain supplier/partner who would ultimately sell the EBS product.  This confidential supplier was in direct competition with another supplier such that if the business relationship and the EBS Trade Secrets were revealed, it would provide an economic advantage to competitors. Upon information and belief, Thorstenson disclosed this confidential business relationship to unauthorized third parties and/or used this information for his own personal gain.

39.     In furtherance of the agreement with QBAS/Rock West, Thorstenson stated that Greater Oceans/Third Eye's prototype fin blades would be delivered to Greater Oceans around the end of March 2020. Greater Oceans never received the prototypes. Upon information and belief, Thorstenson ultimately took them for himself without Greater Oceans' knowledge or permission.

40.     On April 2, 2020, Greater Oceans sent an invoice to Capewell for $5,000, which Capewell had agreed to pay for Greater Oceans' proposal relating to the safety vest and/or EBS product.  To date, Capewell has not paid Greater Oceans' invoice. Upon information and belief, Capewell paid Thorstenson directly instead and continued to be paid by Capewell relating to the safety vest and/or EBS product developed and owned by Greater Oceans.

41.     On April 5, 2020, while still waiting on delivery of the golden samples for the rescue vest, Greater Oceans/Hornbaker issued another purchase order to Cathay to manufacture 300 production-ready rescue vests to be delivered by October 2020, at a total cost of over $50,000.

42.     On April 6, 2020, after Greater Oceans had been in discussions with Rock West regarding the status of the production of the carbon fin blades, Thorstenson initiated a private call with Ethan Gormican of Rock West regarding the blades. This was part of an email chain titled "Third Eye Composite Fin Blade Top Level Business", but communications continued after that call between Thorstenson's private email account and Rock West, and the subject heading changed to a generic fin blade reference without "Third Eye", even though they were still using and referring to the carbon fin blades that Greater Oceans/Third Eye had created.

43.     On April 7, 2020, Thorstenson asked Hornbaker to refrain from wiring money to Cathay in furtherance of their production of the safety vest product until Thorstenson and Hornbaker were able to speak the next day, with no reason as to why. As a result, Greater Oceans lost its place in the production line and was not able to obtain the 300 production-ready rescue vests.

44.     Upon information and belief, on April 7 or 8, 2020, Thorstenson arranged a secret meeting with the CEO of Capewell, John Marcaccio, to offer to develop the EBS product and rescue vest without Greater Oceans' involvement or authorization, even though Greater Oceans owned those products and their respective trade secrets as described herein. Upon information and belief, Thorstenson intentionally sabotaged the existing contractual relations between Capewell and Greater Oceans in order to reap the monetary benefits for himself.

45.     On April 8, 2020, Thorstenson ended his business relationship with Greater Oceans. Thorstenson sent Hornbaker an email indicating that he would no longer perform his obligations under the Consultant Agreement, confirming that he had terminated the Consultant Agreement. For example, Thorstenson wrote in his email that "***My choice*** *is to no longer be an indebted task master to any one company, unless it's my company, or any one person, unless it's me . . .* ***I am looking out for my best interest*** *these days without having to rely on anyone . . .*"

46.     Greater Oceans performed all material obligations owed to Thorstenson under the Consulting Agreement, including but not limited to, paying all invoices submitted by Thorstenson to the extent such invoices meet the requirements of the Consulting Agreement.

47.     On April 8, 2020, the same day he quit Greater Oceans and days after Thorstenson's private meeting with Rock West, Thorstenson emailed Rock West from his private account stating he was excited for the fun business opportunity and that the carbon fins fit Rock West's technical wheelhouse.

48.     Upon information and belief, on or around April 8, 2020, Thorstenson contacted several "Brand Ambassadors" of Greater Oceans, including athletes sponsored by Greater Oceans and attempted to sabotage their personal and contractual relations with Greater Oceans/Hornbaker by falsely informing them that Hornbaker had quit the company and was "no longer in the picture." Upon information and belief, Thorstenson wanted to take advantage of Greater Oceans/Hornbaker's business

contacts, which Hornbaker had expended great efforts over three decades in creating.

49.    Upon information and belief, on or before April 9, 2020, Thorstenson privately informed Sophia Chen of Cathay that he was quitting Greater Oceans and to remove the Third Eye logo from the rescue vests which Greater Oceans created, owned, and had asked Cathay to manufacture. Thorstenson continued to communicate with Ms. Chen without Hornbaker's knowledge and authorization regarding the rescue vests and asked if Cathay could get replacement vests going, using Greater Oceans' Vest Trade Secrets and usurping the business opportunity for his own benefit. In so doing, Thorstenson asked Cathay to direct any communication from Hornbaker to Cathay, to Thorstenson, in order to keep Thorstenson's replacement vest deal a secret and hide his deceptive acts from Hornbaker.

50.    On April 10, 2020, without Greater Oceans/Hornbaker's authorization or prior knowledge, Thorstenson went into the private business email and computer server of Greater Oceans and downloaded all of Greater Oceans' business and confidential information and documents to his personal computer, including but not limited to, those relating to the trade secrets described herein, proprietary product designs, drawings, proposals, email communications between Greater Oceans and its vendors, suppliers, manufacturers, customers, and valuable business contacts, outlines of technical information relating to the products described herein, strategic marketing plans relating to current and future Greater Oceans' products, and intellectual property owned by and/or assigned to Greater Oceans.

51.    Also on April 10, 2020, Thorstenson contacted QBAS, one of Greater Oceans' suppliers, and again attempted to sabotage or undermine the personal and contractual relationships between QBAS and Greater Oceans by informing QBAS that he was no longer involved in Greater Oceans and as a result, the company had become "unstable." Upon information and belief, Thorstenson convinced QBAS to revoke their agreement with Greater Oceans to produce molds for the mask, amphibious goggles, and fin system, leading QBAS to cancel Greater Oceans' pending order due

to their "evaluation of the company stability", after Hornbaker had paid the invoice in full. Greater Oceans was relying on the production of these products to help launch the brand and realize profits.

52.     After Thorstenson quit Greater Oceans, he continued to work with Capewell, QBAS, and Rock West on products and proposals that were developed during Thorstenson's employment with Greater Oceans and for the benefit of Greater Oceans, using intellectual property and the trade secrets described herein which belonged to Greater Oceans. Thorstenson had no authority to use any of Greater Ocean's information or property, especially the confidential trade secrets described herein.

53.     Thorstenson continued working with Capewell on the rescue vest using Greater Oceans' Vest Trade Secrets. Upon learning that Thorstenson was stealing Greater Oceans' contacts and business information, Hornbaker requested that Capewell return the vest to Greater Oceans, but Capewell refused because, upon information and belief, Thorstenson told Capewell that the rescue vest was his, when it was not. Thorstenson also continued working with Capewell on the EBS product using Greater Oceans' EBS Trade Secrets.

54.     On May 14, 2020, Hornbaker asked Cathay to confirm receipt of Greater Oceans' payment for the golden samples and that the production timeline was proceeding as planned. On May 15, 2020, Cathay responded that they did receive Greater Oceans' payment, but Thorstenson had cancelled Greater Oceans' order for the 22 golden samples without Greater Oceans' authorization and behind Hornbaker's back. Upon information and belief, Thorstenson had sabotaged the relationship Greater Oceans had with Cathay/Capewell because he knew how profitable the rescue vests would be to consumers, all because of Hornbaker's trade secret knowledge from years of experience and interviewing consumers in the industry as described above. This also caused Cathay to put on hold Greater Oceans' order for 300 production-ready rescue vests. In turn, it also destroyed the relationship with Quiksilver and their

1  promise to help sell the rescue vest products.

2      55.    Thorstenson also continued working with Rock West, who would later

3  become the first and only client Thorstenson retained when he formed his own

4  company, Ericanwater, in the summer of 2020. Thorstenson would not have Rock

5  West's business without the significant efforts and input on the part of Greater

6  Oceans/Hornbaker. Thorstenson and Rock West continued to work on the carbon fin

7  system using Greater Oceans' Carbon Fin Trade Secrets. Upon information and belief,

8  Thorstenson and Rock West would continue to refer to the carbon fin system as a

9  "Third Eye" project after knowing Thorstenson left Greater Oceans because the

10  system they were building originated from Greater Oceans. Thorstenson took the

11  prototype carbon fin blades that were rightfully Greater Oceans' and used it for Rock

12  West to build upon.

13      56.    On May 11, 2020, after over a month of dead silence, Thorstenson sent

14  Hornbaker his "Third Eye Dissolution Proposal," in which Thorstenson falsely claims

15  that he "*was forced to leave the Company*" and that he "*need[ed] to be compensated.*"

16  Although he possessed no ownership rights in Greater Oceans' contracts, products,

17  trade secrets, and other valuable intellectual property, Thorstenson brazenly claimed

18  that all of these assets belonged to him.

19      57.    Upon learning that Thorstenson was improperly disclosing the

20  confidential trade secrets described herein and using Greater Oceans' confidential

21  business and trade secret information for his own benefit, Hornbaker reached out to

22  his contacts to attempt to remediate the situation and preserve confidentiality. For

23  example, on May 27, 2020, Hornbaker contacted Mr. Marcaccio of Capewell to

24  request the return of a Greater Oceans' prototype rescue vest incorporating the Vest

25  Trade Secrets. Hornbaker emailed Mr. Marcaccio reminding him that "*Greater*

26  *Oceans, Inc. / Third Eye is the sole owner of the SURF/RESCUE Safety Vest IP Rights*

27

28

*and Patented Technology.*"[3] Hornbaker followed up several times, even at one point ***demanding*** return of the prototype otherwise Capewell would be drawn into "anticipated litigation." Despite these demands, Capewell continued to work with Thorstenson on Greater Oceans' rescue vests.

58.     Upon information and belief, Defendants intentionally misappropriated Greater Oceans' confidential and proprietary information consisting and/or relating to the rescue vest and related Vest Trade Secrets, carbon fin system and related Carbon Fin Trade Secrets, EBS proposal/product and related EBS Trade Secrets, mask and related Mask Trade Secrets, amphibious goggles and related Amphibious Goggles Trade Secrets, and fin system and related Fin System Trade Secrets.

59.     Such information was created before or during Thorstenson's employment relationship with Greater Oceans and as such, was property of Greater Oceans. Thorstenson knew and was advised that such information was confidential and not to be disclosed or used without Greater Oceans' authorization, but he violated confidentiality by continuing to pursue business with Greater Oceans' contacts using Greater Oceans' trade secrets and products related thereto as described herein. All of Greater Oceans' customers and business partners as described herein knew that such information was confidential and owned by Greater Oceans. Such information and trade secrets have independent economic value because they were not known to or reasonably available through lawful means to competitors.

60.     Such information, documents, and products are normally only used in good faith for the implementation and operation of Greater Oceans' business and would give a competitor—particularly a start-up competitor with minimal resources—

---

[3] At the time, Hornbaker and Thorstenson believed that the rescue vest was patented, but it was not. Hornbaker later realized that the patent had never processed because Thorstenson used a disbarred patent attorney. Regardless, the specific marketing strategies and business plans related thereto also constituted the Vest Trade Secrets and a patent application/registration would not reveal those confidential items. The parties were to keep the Vest Trade Secrets confidential.

an unfair advantage in competing with Greater Oceans. Upon information and belief, Defendants misappropriated such information, documents, and products in order to unfairly compete against Greater Oceans.  Upon information and belief, Thorstenson and Defendants used and are continuing to use Greater Oceans' Trade Secrets described herein, including Greater Oceans/Hornbaker's business contacts and proposals, without authorization, to create the same products offered by Greater Oceans and market such products to Greater Oceans' customers.

61.    Such information and trade secrets included significant effort, labor, expense, and the decades of years of experience and skill in the surfing/ocean industry by Hornbaker.  They included product concepts, ideas, marketing plans, and strategies which were confidential and not known by competitors. Defendants took advantage of this knowledge and information to their own advantage; knowing that the products described herein would be commercially successful and attractive to consumers, Defendants utilized Greater Oceans' confidential information for its own economic gain.

**D. Thorstenson's Demands for Payment and Newly Created Invoices**

62.    Under the Consulting Agreement, Greater Oceans agreed to pay Thorstenson "*at a rate of one hundred dollars ($100) per hour.*"  In order to be paid, the Consultant Agreement required that "*[a]t the end of each calendar month during the Term, Consultant [Thorstenson] will provide Company with an invoice for the work rendered during such month, including a general description of the work performed, the number of hours worked by Consultant to perform such work (with partial hours worked recorded in six-minute increments), and the total compensation due for such month.*" Ex. C, ¶ 5(b).

63.    Greater Oceans also agreed to "*reimburse Consultant [Thorstenson] for any and all reasonable costs and expenses incurred by Consultant in connection with the Services (including, without limitation, Consultant's travel costs and expenses) provided such costs and expenses have been approved by Company.*" Ex. C, ¶ 5(a).

64.     The Consultant Agreement provides that "*each party shall be released from all obligations and liabilities to the other occurring or arising after the effective date of such termination, except that any termination of this Agreement shall not relieve either party of its obligations that are intended to survive the termination of this Agreement (including, without limitation, any of Company's payment obligations to Consultant)*." Ex. C, ¶ 4(b).

65.     After Thorstenson decided to cease providing services to Greater Oceans and terminated the Consultant Agreement, Thorstenson sent his final invoices to Greater Oceans via email for reimbursement, which was paid by Greater Oceans in full performance of its obligations under the Consulting Agreement.

66.     On May 11, 2020, Thorstenson sent an email confirming that $1,500.00 was the total income he had invoiced and was due from Greater Oceans for 2019:

> In preparation for submitting my 2019 State and Federal income tax forms, I found a mistake in your Greater Oceans Inc. 2019 1099 accounting to me, specifically regarding an expense invoice I submitted to Third Eye August 26, 2019.  Please remove the expense of $2,328.01 from my incorrect 2019 1099 . . .

> Please be aware, to date, the only true partial taxable income I have invoice and received from Third Eye in 2019 was for the total sum amount of $1,500. The first invoice was submitted to you via e-mail on July 9, 2019, for the amount of (9 hours X $100/hr) = $900. The second invoice was submitted to you via e-mail on July 31, 2019, for the amount of (6 hours X $100/hr) = $600. **The total income invoiced by me to Greater Oceans / Third Eye in 2019 was for the sum amount of $1,500.**

67.     On September 4, 2020, months after Thorstenson terminated the Consulting Agreement and ended his relationship with Greater Oceans, attorneys representing Thorstenson sent Hornbaker a letter with various unfounded accusations and demanding payment of $400,000.00.

68.     Initially, the Parties agreed to attempt to resolve their differences through mediation. However, it quickly became apparent that reasoning with Thorstenson

would be futile, leaving Greater Oceans with no choice but to file this Action.

69.     After the Complaint in this Action was filed, Hornbaker was surprised to receive an email from Thorstenson attaching over a dozen new "invoices" totaling approximately $160,000 for services that he purported rendered between January 2019 and April 2020.

70.     Until this Action was filed, Thorstenson had never previously claimed to have performed any of these tasks or sought payment from Greater Oceans for any of the newly invoiced amounts.

71.     Upon information and belief, these new invoices were fabricated by Thorstenson in order to assert breach of contract claims against Hornbaker. Indeed, on February 22, 2021, Thorstenson filed an action in California State Superior Court in Orange County, alleging *inter alia*, breach of the Consulting Agreement and seeking $157,762.60 as damages.

72.     Even ignoring the fact these newly created "invoices" appear to be in large part a work of fiction, they are nearly a year past due and fail to comply with the terms of the Consulting Agreement. For example: (i) none of the invoices were provided "*[a]t the end of each calendar month during the Term*"; (ii) many entries do not include "*a general description of the work performed*"; and (iii) none of the entries include "*partial hours worked recorded in six-minute increments*." *See* Ex. C, ¶ 5(b).

73.     Similarly, although Greater Oceans has an obligation to "*reimburse Consultant [Thorstenson] for any and all reasonable costs and expenses,*" the new invoices include entries for "costs" but do not provide any information, and in any event, no costs "*have been approved by Company*." *See* Ex. C, ¶ 5(a).

74.     The full extent of Thorstenson's betrayal, including the involvement of DOES 1-10, can only be determined through discovery.  Upon information and belief, however, Defendants have developed the exact same product offerings as Greater Oceans with no lead time, when in contrast, it took Greater Oceans at least a year to design these products, refine proposals, pricing, contracts, and develop relationships

with vendors, donors, and customers. Without Greater Oceans' trade secret information described herein, it would be a miracle for Defendants to independently design and develop overnight the exact same products that took Greater Oceans more than a year to create.

75.     Upon information and belief, Thorstenson covertly hid his true intentions in order to steal confidential trade secret information from Greater Oceans, then sabotaged Greater Oceans' contractual relations with its customers, suppliers, and manufacturers in order to usurp Greater Oceans' position in the market and unlawfully take Greater Oceans' profits for his own. Furthermore, upon information and belief, Defendants have also used and are continuing to use Greater Oceans' trade secret information described herein to usurp Greater Oceans' position in the market and unlawfully take Greater Oceans' profits for their own.

76.     Upon information and belief, Defendants unlawfully used Greater Oceans' confidential trade secret information to compete with Greater Oceans, when they could not have developed the same products without Greater Oceans' trade secret information. Upon information and belief, by using Greater Oceans' trade secret information, Defendants have unlawfully profited at Greater Oceans' expense and caused irreparable damage to Greater Oceans.

## FIRST CAUSE OF ACTION

## (Misappropriation of Trade Secrets Under DTSA, 18 U.S.C. § 1836 *et seq.*)

77.     Plaintiff incorporates by reference and re-alleges each and every one of the preceding paragraphs as though fully set forth herein.

78.     At all times relevant herein, Greater Oceans was and still is the lawful owner of the confidential, proprietary, and trade secret information described herein.

79.     The confidential, proprietary, and trade secret information described herein relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and ordered in, interstate commerce by Greater Oceans. Greater Oceans intended to sell the products described herein nationally and

1  worldwide.

2      80.    Greater Oceans advised Thorstenson, a former independent consultant of
3  Greater Oceans, that the trade secret information described herein were confidential
4  trade secrets of Greater Oceans and not to be disclosed to unauthorized third parties or
5  used without Greater Oceans' knowledge or permission.

6      81.    The confidential, proprietary, and trade secret information described
7  herein derives independent economic value, both actual and potential, from not being
8  generally known to others who could obtain economic value from its disclosure or
9  use.

10     82.    Greater Oceans advised all of its business contacts, suppliers,
11 manufacturers, customers, and other relevant third parties, either orally or through
12 written communication, and on a need-to-know basis to manufacture, distribute,
13 market, or sell the products described herein, that such trade secret information was
14 confidential and not to be disclosed to unauthorized third parties or used without
15 Greater Oceans' knowledge or permission.

16     83.    Greater Oceans made other reasonable efforts to maintain the secrecy of
17 the trade secret information described herein, including but not limited to, maintaining
18 a separate and secure email domain that only Thorstenson, Hornbaker, and Virginie
19 (an officer of Greater Oceans) had access to with password protected accounts not
20 known by unauthorized third parties; maintaining a secure computer server with
21 Greater Oceans' information and documents, including the trade secret information
22 described herein; and entering into non-disclosure or confidentiality agreements.

23     84.    Thorstenson misappropriated Greater Oceans' trade secret information
24 during his employment and after he quit Greater Oceans by: (i) downloading all
25 information and documents related to the proprietary products and related trade secret
26 information described herein from Greater Oceans' servers, without Greater Oceans'
27 authorization or knowledge; (ii) disclosing such information to unauthorized third
28 parties and using it in direct competition with Greater Oceans; and (iii) disclosing and

using such trade secret information in other improper and unlawful manners as alleged herein.

85.     Defendants misappropriated Greater Oceans' trade secret information described herein by acquiring it from Thorstenson either knowing or having reason to know Thorstenson acquired such information unlawfully and by improper means, and knowing that such information belonged to Greater Oceans, and then using and disclosing Greater Oceans' trade secret information to directly compete against Greater Oceans. Defendants' ability to create competing products with little to no lead time is solely due to the theft and use of Greater Oceans' trade secret information.

86.     Defendants' misappropriation of Greater Oceans' trade secrets has caused or threatened damage to Greater Oceans, including but not limited to, Greater Oceans' business and business potential as described herein.

87.     As the direct and proximate result of Defendants' misappropriation of Greater Oceans' trade secrets alleged herein, Greater Oceans has suffered damages in an amount to be proven at trial, at least in excess of $400,000.00 and more likely in the millions. Upon information and belief, Defendants' misappropriation of Greater Oceans' trade secret information was willful and malicious, further entitling Greater Oceans to recover exemplary damages and its attorneys' fees and costs.

88.     Defendants' use of Greater Oceans' trade secret information is ongoing and unless enjoined by the Court, Defendants will continue to misappropriate, disclose, and use for their own benefit Greater Oceans' trade secret information causing irreparable harm to Greater Oceans.  Because there has no adequate remedy at law for Defendants' ongoing unlawful conduct, Greater Oceans is entitled to injunctive relief enjoining Defendants from continuing to their unauthorized use and disclosure of Greater Oceans' trade secret information.

## SECOND CAUSE OF ACTION

### (Conversion of Greater Oceans' Property)

89.     Plaintiff incorporates by reference each and every one of the preceding

paragraphs as though fully set forth herein.

90.    At all times relevant herein, Greater Oceans was and still is the lawful owner of certain property, including but not limited to prototype safety vests, safety bladder prototypes, valve system products developed in conjunction with Cathay, carbon fiber fin blades ordered from Rock West, new EBS product samples shared with Capewell, and assorted mask, snorkel, and goggle products. Greater Oceans is the sole owner and has the exclusive right to possess all such property.

91.    Thorstenson intended to interfere, actually interfered, and continues to interfere with Greater Oceans' ownership and right to possession of its property, including the specific examples above, by converting such property for his own use and possession in connection with a business competing with Greater Oceans.

92.    As the direct and proximate result of Thorstenson's unlawful conversion of said property, Plaintiff has suffered damages in an amount to be proven at trial, at least in excess of $400,000.00 and perhaps in the millions.  Upon information and belief, Thorstenson's unlawful conversion of Plaintiff's property was oppressive, fraudulent, willful and/or malicious justifying an award of exemplary and punitive damages.

93.    Thorstenson has refused to return Greater Oceans' property and unless enjoined by the Court, will continue to cause irreparable harm to Greater Oceans. Because there has no adequate remedy at law for Thorstenson's ongoing unlawful conduct, Greater Oceans is entitled to injunctive relief requiring Thorstenson to return Greater Oceans' property.

### **THIRD CAUSE OF ACTION**

#### **(Breach of Contract)**

94.    Plaintiff incorporates by reference and re-alleges each and every one of the preceding paragraphs as though fully set forth herein.

95.    On or about May 2019, Thorstenson and Greater Oceans entered into a binding, valid oral contract relating to the trade secret information described herein

and ownership of such trade secret information, products, and related intellectual property.

96.     Pursuant to the material and essential terms of the agreement, Thorstenson agreed not to disclose or use any of Greater Oceans' confidential information, including its trade secrets described herein. Thorstenson also agreed that Greater Oceans owned all intellectual property created during Thorstenson's employment with Greater Oceans, including the products and trade secrets relating to the products described herein. Greater Oceans would compensate Thorstenson for his contributions to Greater Oceans, its products, and associated trade secrets and intellectual property as an independent consultant.

97.     In late August or early September of 2019, Thorstenson and Greater Oceans entered into the Consulting Agreement, a binding, valid contract for Thorstenson to provide services to Greater Oceans for the development, promotion, marketing, and maintenance of Greater Oceans' products and services. Exh. C.

98.     On February 18, 2020, Thorstenson and Greater Oceans entered into the IP Agreement, a binding, valid contract which assigned "*all proprietary and intellectual property rights, including copyrights and patents, in the concepts and technologies known and described as the 'Inflatable Water Safety Harness with Load Bearing Structure,'*" and specifically "*any patent application rights, potential patent rights, copyrights, and trade secrets relating to the Invention*" to Greater Oceans. Exh. D.

99.     Greater Oceans has fully performed its duties and obligations under the oral and written agreements herein, including but not limited to, compensating Thorstenson for his services.

100.   Thorstenson, by misappropriating Greater Oceans' confidential and proprietary trade secret information as described herein, has willfully breached his obligation under the oral agreement not to disclose Greater Oceans' confidential information and trade secrets.

101.   In using Greater Oceans' confidential information and trade secrets as the basis for Thorstenson and Defendants' independent competing business ventures, Thorstenson has willfully breached his contractual duty under the oral agreement not to use any of Greater Oceans' confidential information and trade secrets in disregard of the oral agreement between Greater Oceans and Thorstenson.

102.   Thorstenson has breached the Consulting and IP Agreements by taking performing the "services" and taking the products as described herein for himself and self-dealing, rather than for Greater Oceans, thereby undermining the agreements.

103.   As a direct and proximate result of the breaches described herein, Thorstenson has caused damage to Greater Oceans, including but not limited to, its business and business potential as described herein, the amount of such resulting damages to be determined at trial, together with interest, costs, and attorneys' fees. Plaintiff is specifically entitled to an award of its costs and fees incurred as the prevailing party in this Action under paragraph 6(a) of the Consulting Agreement.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Covenant)

104.   Plaintiff incorporates by reference and re-alleges each and every one of the preceding paragraphs as though fully set forth herein.

105.   The oral agreement referenced herein and Consulting and IP Agreements entered into between Thorstenson and Greater Oceans contain an implied covenant of good faith and fair dealing.

106.   Greater Oceans reasonably expected certain benefits from those agreements, including but not limited to, the protection of its confidential trade secret information and development, promotion, marketing, and maintenance of Greater Oceans' products as described herein.

107.   Greater Oceans reasonably expected that Thorstenson would act in good faith by not disclosing or using Greater Oceans' confidential trade secret information and carrying out the services to be performed under these agreements for the benefit

of Greater Oceans.

108. As stated herein, Thorstenson has taken actions that have prevented Greater Oceans from receiving its reasonably expected benefits under the terms of the agreements, thereby undermining the agreements.

109. Thorstenson had full knowledge of the terms of both agreements, yet blatantly chose to breach the agreements.

110. Thorstenson intentionally chose not to inform Greater Oceans of its blatant breaches of the agreements.

111. Thorstenson has breached the implied covenant of good faith and fair dealing by engaging in conduct that was unfaithful to the purpose of the agreements between the parties and that deliberately contravened the intent and spirit of the agreements and which interfered with and denied Greater Oceans the benefits of these agreements.

112. As a direct and proximate result of this breach, Thorstenson has caused damage to Greater Oceans in an amount to be determined at trial, together with interests, costs, and attorneys' fees. Plaintiff is specifically entitled to an award of its costs and fees incurred as the prevailing party in this Action under paragraph 6(a) of the Consulting Agreement.

## FIFTH CAUSE OF ACTION

### (Breach of the Duty of Loyalty)

113. Plaintiff incorporates by reference and re-alleges each and every one of the preceding paragraphs as though fully set forth herein.

114. Whether classified as an employee or consultant, Greater Oceans expected the undivided loyalty of persons, including Thorstenson, who worked for Greater Oceans and to advance Greater Oceans' interests.

115. As a key independent consultant of Greater Oceans, Thorstenson owed Greater Ocean his undivided loyalty and was obligated to act within the best interests of Greater Oceans. Likewise, Greater Oceans was entitled to place its trust and

confidence in Thorstenson and did in fact expect that he would represent Greater Oceans' bests interests, rather than his own interests, when conducting and procuring business relationships with third parties relating to the products described herein. For example, Greater Oceans relied on Thorstenson's presumed loyalty and integrity in the faithful performance of his duties and responsibilities under the oral and written agreements described herein.

116.   During the course of acting as an independent consultant to Greater Oceans, Thorstenson breached his duty of loyalty by starting or attempting to start a new business to directly compete against Greater Oceans while pretending to work on behalf of Greater Oceans.

117.   Upon information and belief, Thorstenson was secretly working against Greater Oceans' business interests while he was under contract, and thus acted willfully and maliciously in breach of his duty of loyalty to Greater Oceans. As the direct and proximate result of Defendants' unlawful conduct alleged herein, Greater Oceans is entitled to compensatory and punitive damages in an amount to be determined at trial, and at a minimum, Thorstenson must forfeit all benefits obtained from Greater Oceans during the period of his disloyalty.

## SIXTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

118.   Plaintiff incorporates by reference and re-alleges each and every one of the preceding paragraphs as though fully set forth herein.

119.   Greater Oceans engaged Thorstenson to provide services to Greater Oceans a key independent consultant, entrusting Thorstenson with extremely valuable confidential information and trade secrets as described herein.

120.   As such, Thorstenson owed Greater Oceans a fiduciary duty and is obligated to act in Greater Oceans' best interests as an agent of Greater Oceans. Likewise, Greater Oceans was entitled to place its trust and confidence in Thorstenson and did in fact expect that he would represent Greater Oceans' bests interests, rather

than his own interests, when conducting and procuring business relationships with third parties relating to the products described herein. For example, Greater Oceans relied on Thorstenson's fiduciary duty and integrity in the faithful performance of his duties and responsibilities under the oral and written agreements described herein.

121.   During the course of acting as an independent consultant to Greater Oceans, Thorstenson breached his fiduciary duty by starting or attempting to start a new business to directly compete against Greater Oceans while pretending to work on behalf of Greater Oceans and disclosing and using Greater Oceans' confidential trade secret information described herein to his own benefit.

122.   Upon information and belief, Thorstenson was secretly working against Greater Oceans' financial and business interests while he was under contract, thus acted willfully and maliciously in breach of his fiduciary duty. As the direct and proximate result of Defendants' unlawful conduct alleged herein, Greater Oceans is entitled to compensatory and punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Tortious Interference with Contractual Relations)

123.   Plaintiff incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

124.   Greater Oceans had existing binding and valid oral or written contractual and business relationships with Capewell, Cathay, QBAS, Rock West, and Quiksilver that had all essential and material terms specified, including the safety vest and EBS product development proposal agreed upon and/or invoiced to Capewell, the manufacturing proposal agreed upon and purchase orders issued to Cathay relating to the safety vest, the exclusive business arrangement and financial terms agreed upon with QBAS to create tooling and molds for Greater Oceans' new mask, amphibious goggles, and fin products, the exclusive business arrangement regarding the carbon fin system with Rock West, and the retail/distribution arrangement with Quiksilver regarding the safety vests.

125.   With full knowledge of Greater Oceans' contractual and business relationships with each of the third parties identified herein and the essential and material terms agreed upon between Greater Oceans and those third parties Capewell, Thorstenson, by his unlawful conduct as described herein, intentionally induced a breach or disruption of the contractual relationship with such third parties and actually caused the breach and/or termination of the contractual and business relationships as each of them refused to continue to work with Greater Oceans or otherwise halted production of the products contemplated during the business relationship.

126.   Thorstenson's unlawful conduct as set forth herein sabotaged Greater Oceans' contractual relations with such third parties and prevented each of them from performing their material obligations owed to Greater Oceans and Greater Oceans' obligations in return, including the respective business arrangements and agreements described herein.

127.   As a direct and proximate result of Thorstenson's intentional interference in the contractual and business expectancy relations between Greater Oceans and Capewell, Cathay, QBAS, Rock West, and Quiksilver, Greater Oceans has suffered a loss of income and diminution in the value of its business, including the potential to make income in the future on the products and business relationships described herein, the full amount such damages to be determined at trial.  Upon information and belief, the acts of Thorstenson were oppressive, fraudulent, willful or malicious so as to justify an award of exemplary and punitive damages against Thorstenson, together with reasonable costs and attorneys' fees.

## EIGHTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

128.   Plaintiff incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

129.   Greater Oceans has developed and maintained valuable and advantageous economic relationships with its customers, suppliers, and partners, including but not

limited to, Capewell, Cathay, QBAS, Rock West, and Quiksilver.   At all times relevant herein, there was a reasonable probability of continuing and future economic benefit to the Greater Oceans from these relationships, and Greater Oceans expected these economic relationships to continue absent interference by Thorstenson. These business relationships would have yielded future economic benefit to Greater Oceans as they were key players in manufacturing, distributing, and selling the products described herein to consumers the world over.

130.   With knowledge of the business and economic relationships that Greater Oceans has formed, Thorstenson intentionally and wrongfully interfered with the Greater Oceans' relationships with such third parties. Such interference includes, among other things, soliciting Greater Oceans' customers, suppliers, and partners using and trading on knowledge of Greater Oceans' valuable trade secret information as described herein. Thorstenson also interfered with Greater Oceans' business and contractual relationships with such third parties to take those business opportunities for himself. Upon information and belief, Thorstenson intended to divert the benefits and profits of such relationships away from Greater Oceans and to Defendants and Thorstenson.

131.   As a direct and proximate result of Thorstenson's wrongful and intentional interference with the prospective economic relationships between Greater Oceans and its customers, suppliers, and partners, including but not limited to Capewell, Cathay, QBAS, Rock West, and Quiksilver, those relationships have been actually disrupted and caused Greater Oceans to suffer a loss of income and diminution in the value of its business, including the potential to receive future income from the products described herein, the full amount of damages suffered as a result to be determined at trial.  Upon information and belief, the acts of Thorstenson were oppressive, fraudulent, willful or malicious so as to justify an award of exemplary and punitive damages against Thorstenson, together with reasonable costs and attorneys' fees.

## NINTH CAUSE OF ACTION

### (Unfair Competition in Violation of Cal. Bus. & Prof. Code, § 17200 *et. seq.*)

132.   Plaintiff incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

133.   By committed the wrongful acts and violating other federal and state laws described herein, Thorstenson and Defendants committed an "unlawful", unfair, and/or fraudulent business practices and unfair competition in violation of Cal. Bus. & Prof. Code, § 17200 *et. seq.*

134.   Upon information and belief, Defendants' unlawful, unfair, and/or fraudulent business practices were willfully undertaken with full knowledge of the value in Greater Oceans' trade secret information and with the intent to misappropriate Greater Oceans' trade secret information for their own financial gain.

135.   As a direct and proximate result of the foregoing acts, Greater Oceans has suffered and will continue to suffer significant injuries, entitling Greater Oceans to all available relief provided for under the California Unfair Business Practices Act, Cal. Bus. & Prof. Code, § 17200 *et. seq.*, including an accounting and disgorgement of all illicit profits that Defendants made on account of its deceptive, unfair, and fraudulent business practices.

136.   Defendants' unlawful, unfair, and fraudulent business practices are ongoing and unless enjoined by the Court, Defendants will continue to unfairly compete with Greater Oceans, causing irreparable harm.   Because there has no adequate remedy at law for Defendants' ongoing unlawful conduct, Greater Oceans is entitled to injunctive relief enjoining Defendants from unfair competition.

## TENTH CAUSE OF ACTION

### (Declaratory Judgment That Greater Oceans Did Not Breach the Consulting Agreement – Cal. Code Civ. Proc. § 1060)

137.   Plaintiff incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

138.   As set forth herein, Thorstenson and Greater Oceans entered into the Consulting Agreement.

139.   There exists an actual and present controversy between Thorstenson and Greater Oceans relating to the legal rights and duties of the Parties under the Consulting Agreement, specifically, whether Thorstenson is entitled to payment for invoices created after he terminated the Agreement.

140.   Greater Oceans respectfully requests that the Court issue a declaration that Greater Oceans did not breach the Consulting Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment in its favor and against Defendants Eric Thorstenson and DOES 1-10 as follows:

A.     An award of damages for actual loss and unjust enrichment caused by Defendants' misappropriation of Greater Oceans' trade secret information, conversion of property, intentional interference in the contractual relations or prospective economic, breach of oral contract, fiduciary duty and duty of loyalty;

B.      An award of exemplary damages in an amount equal to treble the amount of the compensatory damages awarded;

C.     An award of Greater Oceans' reasonable attorneys' fees and costs;

D.     A preliminary and permanent injunction prohibiting Defendants from using, accessing, disclosing, or continuing to possess Greater Oceans' trade secret information, and ordering the return of Greater Oceans' trade secret information; and

E.     All other relief that the Court may deem just and proper.

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

Dated:      August 19, 2022          **BLAKELY LAW GROUP**

                                By:    /s/ Tara A. Currie
                                       Brent H. Blakely
                                       Tara A. Currie
                                       ***Attorneys for Plaintiff***
                                       ***Greater Oceans, Inc.***

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Greater Oceans, Inc. hereby demands a trial by jury as to all claims in this action so triable.

Dated:      August 19, 2022          **BLAKELY LAW GROUP**

                                By:    /s/ Tara A. Currie
                                       Brent H. Blakely
                                       Tara A. Currie
                                       ***Attorneys for Plaintiff***
                                       ***Greater Oceans, Inc.***

**PLAINTIFF'S SECOND AMENDED COMPLAINT**