1
2
3
4
5
6
7
8    **UNITED STATES DISTRICT COURT**
9    **CENTRAL DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| GREATER OCEANS, INC., a California Corporation, | ) CASE NO.: 2:20-cv-11340- MEMF-PLA ) |
| | ) **FINDINGS OF FACT AND CONCLUSIONS** |
| Plaintiff, | ) **OF LAW AFTER BENCH TRIAL** ) |
| | ) |
| v. | ) |
| | ) **Hon. Maame Ewusi-Mensah Frimpong** |
| ERIC THORSTENSON, an individual; and DOES 1-10, inclusive, | ) Pretrial Conference: March 29, 2023 ) Trial Date:          April 17, 2023 |
| | ) |
| Defendants. | ) |

19
20
21
22
23
24
25
26
27
28

Plaintiff Greater Oceans, Inc. ("Greater Oceans") and Defendant Eric Thorstenson appeared for a bench trial before this Court on July 10–11, 2023. On August 28, 2023, the parties filed their closing briefs. ECF Nos. 155 ("Pl. Brief"), 156 ("Def. Brief"). On September 11, 2023, the parties filed their responses to the closing briefs. ECF Nos. 159 ("Pl. Reb. Br."), 160 ("Def. Reb. Br."). Pursuant to Fed. R. Civ. P. 52, the Court renders its Findings of Fact and Conclusions of Law.

## I.    BACKGROUND

Greater Oceans brings this action concerning a dispute arising from the breakdown of the parties' business relationship. Greater Oceans alleges that Thorstenson misappropriated and stole its trade secrets, unfairly competed with it, and breached applicable contractual and fiduciary duties to it. Thorstenson denies the claims and brought counterclaims based on fraud and misrepresentation. Regarding damages, Greater Ocean seeks damages in the form of lost profits from trade secrets related to its products that it alleges Thorstenson misappropriated.

Any finding of fact deemed to be a conclusion of law is hereby incorporated into the Conclusions of Law. Any conclusion of law deemed to be a finding of fact is hereby incorporated into the Findings of Fact.

## II.    WITNESS CREDIBILITY

The credibility of witness testimony is to be determined by the trier of fact. The trier of fact may choose to believe all, none, or portions of a witness's testimony if it is determined that the witness has testified untruthfully. The trier of fact "need not accept uncontradicted testimony when good reasons appear for rejecting it," including witness interests, improbability, and discrepancies within the testimony. *Lau Ah Yew v. Dulles*, 257 F.2d 744, 746 (9th Cir. 1958). In determining the credibility of a witness's testimony, the trier of fact may "consider the witness's demeanor and manner while on the stand, the character of his testimony as being probable or improbable, inconsistencies, patent omissions and discrepancies in his testimony, or between the testimony of different witnesses, contradictory testimony, his interest in the outcome of the case, his relationship to the litigants, and many other factors hearing upon the truthfulness or untruthfulness of the witness's testimony." *Young Ah Chor v. Dulles*, 270 F.2d 338, 341 (9th Cir. 1959).

Considering all of these factors, the Court found Thorstenson's testimony to be not credible with respect to critical aspects of his case, including who wanted to cut his wife out of company ownership, whether he was deceived into giving up IP ownership, whether he sabotaged certain company relationships with vendors, and the amount of work he did over the course of the Greater Ocean relationship. In particular, the Court made this credibility determination based upon his demeanor and manner which did not appear forthright,[2] the improbability of much of his testimony about being deceived or forced into cutting his wife out of ownership, patent omissions and discrepancies in his testimony, his interest in winning the case, and his fraught relationship with Hornbaker and clear anger at him.

## III.  FINDINGS OF FACT

### A.  The Parties

1. Greater Oceans DBA Third Eye is a corporation duly organized and existing under the laws of the State of California, with its principal place of business located in Dana Point, California. Admitted Facts[3] 1.

2. Eric Thorstenson is an individual residing in San Diego, California. AF2.

3. Jeffery Hornbaker is the owner and principal of Greater Oceans. AF3.

### B.  The Formation of Greater Oceans

4. In the mid-1990s, Hornbaker created Third Eye, which at that time, was primarily used in connection with clothing and Hornbaker's film and photography work. July 10 at 116:21-118:1.

5. In 2018, Hornbaker and Thorstenson started to work together to develop and market water safety products under the name "Third Eye." AF4.

6. In May 2019, Hornbaker and Thorstenson worked with Auctus Law to assist in the formation of Greater Oceans DBA Third Eye as a corporation. AF5.

---

[2] In fact, Thorstenson's demeanor was so combative on the first day of testimony that he felt compelled to apologize to the Court at the beginning of the second day. July 11 at 4:25-5:6.

[3] All Admitted Facts ("AF") are taken from the Final Pretrial Conference Order ("Final Pretrial Order"). ECF No. 144 at 4 & 5. AF are labelled with their corresponding number in the Final Pretrial Order (*e.g.*, Admitted Fact 2 is referred to as "AF2").

7.    In March 2019, Greater Oceans set up a password-protected email accounts for Thorstenson, Hornbaker, and its only other employee, Virginie Miramon. July 11 at 72:25-73:16.

8.    Hornbaker and Thorstenson initially contemplated that they would be 50/50 partners. July 11 at 49:11-18.

9.    As a result of his divorce proceedings, Thorstenson had indicated that he did not want to become a part owner of Greater Oceans at that time, and instead asked to become an independent consultant for Greater Oceans instead of 50/50 ownership to ensure that his future ex-wife did not have any claim to ownership of Greater Oceans. He instructed his attorneys accordingly. Ex. 17.

10.   Thus, at the time Greater Oceans was formed, Hornbaker was 100% owner of the company. AF7.

11.   Greater Oceans was incorporated on May 27, 2019. AF6.

12.   Hornbaker and Thorstenson agreed that they would discuss Thorstenson becoming a co-owner after the divorce was finalized and that all corporate formalities would be followed in doing so. July 11 at 53:23-55:5.

**C.    Thorstenson's Contracts with Greater Oceans**

13.   On July 9, 2019, Thorstenson executed the Independent Consulting Agreement ("IC Agreement") with Greater Oceans. Ex. 3.

14.   Thorstenson backdated the IC Agreement for it to have an Effective Date of June 4, 2019. July 10 at 44:2-25.

15.   The IC Agreement provides that Greater Oceans solely owns the products and services which Thorstenson develops for Greater Oceans during his consultancy. Ex. 3.

16.   On or about August 5, 2019, Thorstenson executed the Consulting Agreement with Greater Oceans. Ex. 3.

17.   Thorstenson backdated the Consulting Agreement to have an Effective Date of May 28, 2019. Ex. 3.

18. The Consulting Agreement provides that Consultant will provide services to Greater Oceans for the development, promotion, marketing and maintenance of Greater Oceans' products and services. Ex. 3.

19. The Consulting Agreement also provides that Greater Oceans will pay Thorstenson $100 per hour in consideration for his services to Greater Oceans, provided he submits an invoice at the end of each calendar month during the term, including a general description of the work performed, the number of hours worked by Thorstenson to perform such work (with partial hours worked recorded in six-minute increments), and the total compensation due for such month. Ex. 3.

20. On February 18, 2020, Thorstenson executed the Intellectual Property Assignment. AF9.

21. The Intellectual Property Assignment provides that Thorstenson is assigning the entire right, title, and interest in the "Inflatable Water Safety Harness With Load Bearing Structure" to Greater Oceans. Ex. 3.

**D.    Greater Oceans' Product Offerings**

22. Hornbaker and Thorstenson worked together to develop the following product offerings: Safety Vest, Low Volume Mask, Amphibious Goggles, ONO Fins, and Composite/Carbon Fins. Ex. 69, July 10 33:2-34:6, 74:13-23.

**E.    Thorstenson's Termination with Greater Oceans and Accessing Greater Oceans' Emails and Documents.**

23. On April 8, 2020, Thorstenson advised Hornbaker that he was quitting Greater Oceans. Ex. 34, July 11 at 55:23-56:17.

24. On April 9, 2020, Thorstenson accessed Greater Oceans' private account and email server and forwarded emails and attachments containing confidential information and documents, including trade secrets, to his personal email. Such emails and attachments related to Greater Oceans' product offerings—amphibious goggles, low volume masks, surf/safety vest, ONO fin/carbon fiber fin blades, and snorkels. July 10 at 79:11-23.

25.    On May 11, 2020, Thorstenson sent Hornbaker/Greater Oceans his Third Eye
       Dissolution Proposal, claiming 50% ownership in Greater Oceans. Ex. 39.

26.    The proposal described Thorstenson's understanding of the contributions he had made
       to Greater Oceans and the agreement that he and Hornbaker had regarding
       Thorstenson's future ownership of Greater Oceans. Ex. 39.

27.    Hornbaker responded to the proposal disputing the various claims. Ex 188.

**F.    Greater Oceans' Relationship with Cathay**

28.    In 2019, Greater Oceans began working with Cathay Consolidated Inc. ("Cathay") to
       manufacture and develop a safety/surf vest with harness. Ex. 78.

29.    Greater Oceans entered an oral contract with Cathay for Cathay's services to Greater
       Oceans in developing its products. Ex. 78.

30.    The safety/surf vest with harness that Greater Oceans was developing with Cathay was
       based in part off the Airlift vest. AF10.

31.    Greater Oceans/Hornbaker and Thorstenson both contributed to the development of
       the safety/surf vest with harness. Ex. 78.

32.    Greater Oceans paid for Cathay's services and products. Ex. 62.

33.    Cathay created prototypes of the safety/surf vest with harness for Greater Oceans.
       AF11.

34.    The safety/surf vest garnered interest from Quiksilver, who was prepared to put in an
       order for 300 vests and wanted to continue working with Greater Oceans on other
       vests and products. Ex. 131.

35.    Greater Oceans ordered 22 replacement vests and 300 additional vests from Cathay.
       Ex. 60.

36.    After Thorstenson quit, Thorstenson effectively canceled these pending orders. Ex. 60.

37.    Thorstenson also spoke poorly of Greater Oceans and Hornbaker to Cathay, calling
       Hornbaker "deceptive" and accusing him of "stealing" Thorstenson's intellectual
       property. Ex. 60.

38.    Thorstenson also indicated that he wished to keep the vests manufactured by Cathay and to continue working with Cathay. Exs. 60, 460.

**H.    Greater Oceans' Relationship with QBAS**

39.    In 2018, Hornbaker and Thorstenson began working with QBAS Co., Ltd. ("QBAS") to develop masks, snorkels, goggles, and fins for Greater Oceans. AF13.

40.    Greater Oceans entered into an oral contract with QBAS for its development of products for Greater Oceans. Ex. 70.

41.    Greater Oceans/Hornbaker and Thorstenson both contributed to the development of the masks, snorkels, goggles, and fins with QBAS. Ex. 70.

42.    The fins being developed with QBAS were based on Greater Oceans' ONO Fin concept and design. Ex. 80.

43.    Greater Oceans paid for QBAS's services and products. Ex. 134.

44.    QBAS created fin prototypes for Greater Oceans. Exs. 77, 102.

45.    Greater Oceans and QBAS planned to work together on the production of masks, goggles, and ONO fins. July 11 at 89:21-90:19.

46.    Thorstenson advised QBAS that he would be quitting Third Eye in advance of notifying Hornbaker. Ex. 174.

47.    He also advised QBAS that he was "embarrassed" to have introduced QBAS and Hornbaker, and that Hornbaker engaged in "bad business practices." Ex. 174.

48.    He counseled QBAS to "please be careful working with [Hornbaker]" and to "[p]lease proceed with caution regarding [Hornbaker]." Ex. 174.

49.    Thorstenson conveyed his intention to continue working with QBAS. Ex. 174.

50.    Thereafter, QBAS stated that it wanted to hold off on working with Greater Oceans any further until its dispute with Thorstenson was resolved. Ex. 197, July 11 at 93:13-23.

51.    Although QBAS continued to work with Greater Oceans, due to "a lot of . . . animosity" (presumably created by Thorstenson's departure and the comments made

1    by him to QBAS) QBAS only filled Greater Oceans' orders sporadically and, at times,

2    wrongly, along with other complications. July 11 at 169:9-170:5.

3    **I.**    **Greater Oceans' Relationship with Rock West**

4    52.    In February 2020, Greater Oceans began working with Rock West to develop a carbon

5    fiber fin blade. Ex. 52.

6    53.    Greater Oceans entered into an oral contract with Rock West for the development and

7    collaboration of the carbon fiber fin blade. Ex. 52.

8    54.    The carbon fiber fin blade was based on the fins/ONO Fin that QBAS was developing

9    for Greater Oceans, including the fin prototype(s) that QBAS created for Greater

10    Oceans. July 11 at 98:15-24.

11    55.    Greater Oceans presented Rock West with a business proposal outlining various

12    products, including the carbon fiber fin blade, collaboration opportunities, and

13    marketing strategies. Exs. 52, 410.

14    56.    Greater Oceans/Hornbaker and Thorstenson both contributed to the business proposal

15    mentioned above and the carbon fiber fin blade development. Ex. 52.

16    57.    It was estimated that the carbon fiber fin blades could realize $3 to $6 million in sales

17    annually. Ex. 54.

18    58.    Greater Oceans and Rock West were in discussions to develop a carbon fiber fin

19    product. Exs. 52, 144, 149.

20    59.    After Thorstenson quit, Thorstenson continued working with Rock West on the carbon

21    fiber fin blades that were originally developed during his consultancy with Greater

22    Oceans.  Ex. 53, July 10 at 153:22-24, 157:19-158:10.

23    60.    After Thorstenson quit, Thorstenson was in possession of the prototype surf/safety

24    vest and prototype carbon fiber fin blade belonging to Greater Oceans. Ex. 45.

25    61.    Rock West went on to launch a "marine safety division," headed by Thorstenson, and

26    offering the composite carbon fiber fins as originally envisioned by Greater Oceans.

27    Ex. 414.

28

62.     In 2022, Rock West received wide interest in the carbon fiber fin blades Thorstenson helped develop. Rock West received a production order to manufacture 500 carbon composite dive fin blades and that customer's goal was to purchase 2000+ pairs of fin blades annually. Ex. 416.

**E.      Greater Oceans' Relationship with Quiksilver**

63.     Hornbaker performed consulting work for Quiksilver, Inc. ("Quiksilver") for approximately 25 years or more. As a result, he established lasting business relationships with Quiksilver and its employees, including but not limited to, Bob McKnight. July 10 at 115:9-23.

64.     Hornbaker collaborated with Quiksilver to release a signature line of Third Eye apparel. July 10 at 117:13 - 118:1.

65.     In approximately 2015, Quiksilver developed an inflatable vest named the "Airlift". July 10 at 118:3-8.

66.     In 2018, Hornbaker and Thorstenson began discussing with Quiksilver Greater Oceans' product offerings and collaborating on one or more of its products. July 10 at 119:23-121:19.

67.     In 2019, Greater Oceans obtained Quiksilver's approval to develop a surf/safety vest based in part on the Airlift vest. Ex. 82.

68.     Although Quiksilver had planned to enter into a business arrangement with Greater Oceans for its Third Eye line of safety products, after Thorstenson quit, QuikSilver did not move forward with these plans because of the dispute between Hornbaker and Greater Oceans, on the one hand, and Thorstenson on the other. July 10 at 124:14-125:16.

**G.      Greater Oceans' Relationship with Capewell**

69.     Greater Oceans and Capewell Aerial Systems LLC ("Capewell") entered into discussions regarding a number of products, including safety vests. Ex. 31.

70.     On May 9, 2019, Greater Oceans and Capewell entered into an Independent Consultant Agreement for Greater Oceans' consulting services to Capewell. AF12.

71. The Independent Consultant Agreement contained a provision prohibiting the disclosure of Greater Oceans' confidential information and intellectual property exchanged with Capewell. Ex. 23 at GO 012264-102265.

72. Under the Agreement, Capewell would distribute the safety/surf vest that Greater Oceans was developing with Cathay. Ex. 31, 32.

73. Capewell was interested in Greater Oceans' safety vest product and placed a soft order for 300 vests at $600 each with Greater Oceans. July 11 at 80:25–81:6, 84:5–18.

74. Greater Oceans expected to make $100,000-$120,000 in profit from the sale of these 300 vests to Capewell. July 11 at 84:19-22.

75. After Thorstenson quit, Thorstenson continued working with Capewell to develop an EBS system. Exs. 46, 47.

**K.    Payment for Thorstenson's Services**

76. Greater Oceans paid for the only two invoices Thorstenson submitted for his work in 2019, for $1500 ($900 and $600). Ex. 21.

77. Greater Oceans reimbursed Thorstenson for expenses incurred when he submitted the same to Greater Oceans in 2019. Exs. 24, 67, 68.

78. As early as April 14, 2020, Thorstenson notified QBAS of the following: "Confidentiality speaking, regarding all of the work I've brought to [J]eff and completed for Jeff/[T]hird Eye over the last year: I a[m] in the process of sorting out all of the IP, revenue, contacts, etc. I've openly provided to Jeff/Third Eye and will soon be invoicing him for my consulting services." Ex. 174 at ET34760.

79. Eight months later, on December 15, 2020, Greater Oceans sued Thorstenson. Compl.

80. After learning that he was being sued, Thorstenson sent Hornbaker and Greater Oceans invoices for billable hours from January 2019 to April 2020. Ex. 4, 26 July 10 at 84:22-25, 85:11-18, AF16.

81. The invoices submitted in December were dated November 19, 2020. Ex. 4, AF16.

82. Prior to November 19, 2020, Thorstenson never submitted any invoices to Greater Oceans for work performed or expenses incurred from January 2019 to April 2020,

1      except for the invoices and expenses Greater Oceans already paid and reimbursed him

2      for. AF17.

3  83.    In his divorce proceeding, in October 2019, Thorstenson asserted that his gross

4      income from Greater Oceans from April 2019 through October 2019 was $3500. Ex.

5      19.

6  84.    In his divorce proceeding, in November 2019, Thorstenson asserted that he worked as

7      an independent consultant and did work for Greater Oceans, describing it as a

8      "business owned by Jeff Hornbaker." Ex. 20.

9  85.    In March 2019, Thorstenson prepared a Schedule of Assets and Debts that listed

10      "Third Eye" under "Partnerships and Other Business Interests." Ex. 252. This

11      document was not filed with the court in connection with the divorce proceeding, and

12      it is unclear whether or when it was submitted to the other party in the divorce

13      proceeding. July 10 at 195:11–196:17.

## IV.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

16  86.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

17      1331 and the trade secret laws of the United States, 18 U.S.C. §§ 1836, 1839 et seq.

18  87.    This Court has supplemental jurisdiction over Greater Ocean's state law claims under

19      28 U.S.C. § 1367(a).

20  88.    This Court has personal jurisdiction over the parties because the acts or omissions

21      giving rise to Greater Ocean's claims occurred in California. The Court also has

22      personal jurisdiction over the parties because the parties agreed to jurisdiction in state

23      or federal courts of California under the contracts at issue.

24  89.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and the parties'

25      stipulation to jurisdiction.

26

27  ///

28  ///

**B. Greater Oceans' First Claim for Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.**

90.     To establish a claim for Misappropriation of Trade Secrets under the Defend Trade Secrets Act, Greater Oceans must demonstrate the following, by a preponderance of the evidence: (1) Greater Oceans owned a trade secret; (2) Thorstenson misappropriated the trade secret; and (3) Thorstenson's actions damaged Greater Oceans. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993); *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998); 18 U.S.C. § 1839(5).

91.     A trade secret is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" so long as the owner (a) "has taken reasonable measures to keep such information secret" and (b) "derives independent economic value" from being secret. *U.S. v. Chung*, 659 F.3d 815 (9th Cir. 2011); 18 U.S.C. § 1839(3).

92.     "Reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and controlling plant access." *Chung*, 659 F.3d at 825; § 1 Definitions., Unif. Trade Secrets Act § 1.

93.     The standard to show that trade secrets derive independent economic value is not a high standard. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others." Restatement (Third) of Unfair Competition § 39 (1995); 18 U.S.C. § 1839(3).

94. "The information must derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d at 657 (quotations omitted); 18 U.S.C. § 1839(3).

95. The case law establishes that a plan to develop a product is insufficient, but does not establish that the only valid trade secrets for jurisdictional purposes are those embodied in a physical product already being sold in interstate commerce.[4] Such an interpretation would permit persons to freely steal trade secrets as long as they do so before the first product is sold. Misappropriation under the DTSA requires: either (1) the "[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means" or (2) the "[d]isclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5). Thus, to state a claim for trade secret misappropriation under the DTSA, a plaintiff must allege that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." 3 Callmann on Unfair Comp., Tr. & Mono. § 14:15 (4th ed.) ("Under the DTSA, to prove misappropriation, a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty."). *See iSpot.tv, Inc. v. Teyfukova*, No. 221CV06815MEMFMARX, 2023 WL 1967958, at *9 (C.D. Cal. Jan. 25, 2023).

96. Acquisition of a trade secret by improper means includes theft as well as breach of a duty to maintain secrecy. *Id.*; *see also* 18 U.S.C. § 1839(6).

---

[4] See the authorities cited by Thorstenson in his brief. Def. Brief at 7.

*Safety Vest*

97.   Greater Oceans has demonstrated that the following constitute a trade secret: "'over pressure' valve design; internal H Harness system comprised of a floatation device attached to a weight bearing harness structure that also allows for multiple accessories, handles, external floatation devices, communication devices, etc. to be attached; manual inflation, as well as inflation on demand versions, comprised of 2 or 4 $CO_2$ actuators; unique zipper entry design, whether it would be horizontal, vertical or diagonal along with torso straps attached to the internal harness structure for additional integrity." Pl. Brief at 7.

98.   Greater Oceans has demonstrated that it took reasonable measures to maintain the secrecy of the asserted trade secret. Ex. 111; July 10 at 124:14-24; July 10 at 71:16-73:16, 78:18-23. The later filing of a patent application does not defeat this element.

99.   Greater Oceans has also demonstrated that each of the asserted trade secrets derived independent economic value from being secret as the products were unique in the marketplace.

100.   Greater Oceans has also demonstrated that each of the asserted trade secrets was related to a product in interstate commerce. Thorstenson's arguments that trade secrets consisting of technical drawings do not constitute a trade secret is unavailing. As discussed above, the case law establishes that a plan to develop a product is insufficient, but does not establish that the only valid trade secrets for jurisdictional purposes are those embodied in a physical product already being sold in interstate commerce. Such an interpretation would permit persons to freely steal trade secrets as long as they do so before the first product is sold.

101.   Greater Oceans has failed to establish theft of the secrets. Greater Oceans claims that the download of company emails is the basis of the alleged theft, but the mere download of the emails without more does not establish theft.

102.   Even if the download of the emails did establish theft, and therefore misappropriation, Greater Oceans has failed to show any damages from the theft. Greater Oceans has

1    demonstrated how it was harmed by Thorstenson's self-dealing, but not how it was

2    harmed by any alleged theft as it did not show that the secrets played any role in the

3    self-dealing. Thorstenson sabotaged the Greater Oceans' contracts by going behind

4    Hornbaker's back to speak badly of Greater Oceans, not by doing anything related to

5    the downloaded emails.

6    103.    Greater Oceans has also failed to establish breach of the duty of secrecy. Merely

7    downloading the emails (and by definition holding on to them) does not establish that

8    he breached any duty to keep them secret. Greater Oceans has not established that

9    Thorstenson failed to keep them secret.

10    104.    Greater Oceans fails to show the other means of misappropriation—namely use or

11    disclosure.

12    105.    Therefore, the misappropriation claim fails as to the safety vest.

13    ***Low Volume Mask***

14    106.    Greater Oceans fails to demonstrate that the following constitute a trade secret:

15    "developments made to a version of a popular mask that exists in the marketplace, but

16    with a better fit and low volume frameless profile and provides for peripheral vision to

17    allow the diver a partial rear view, which was going to be part of Greater Oceans'

18    DEEP SPACE series." Pl. Brief at 8.

19    107.    To the contrary, based upon review of the evidence cited by Greater Oceans in support

20    of this claim, the purported secrets appear to be inchoate ideas to be developed in the

21    future.

22    108.    Therefore, the misappropriation claim fails as to the low volume mask.

23    ***Amphibious Goggles***

24    109.    Greater Oceans fails to demonstrate that the following constitute a trade secret: "the

25    goggle being open to airflow above the surface of the water but able to seal below the

26    surface of the water with either an overlaying flap design, or a camlock hinge system

27    that would allow the diver to use the goggle above and below the water, with a

28    possible strap on the back to adhere the goggle." Pl. Brief at 8.

14

110.    To the contrary, based upon review of the evidence cited by Greater Oceans in support of this claim, the purported secrets appear to be inchoate ideas to be developed in the future.

111.    Therefore, the misappropriation claim fails as to the amphibious goggles.

**ONO Fins**

112.    Greater Oceans has demonstrated that the following constitute a trade secret: "█████ ███████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████" Pl. Brief at 8.

113.    Greater Oceans has demonstrated that it took reasonable measures to maintain the secrecy of the asserted trade secret. Ex. 111; July 11 at 71:16-73:16, 89:21-90:8, 91:4-15.

114.    Greater Oceans has also demonstrated that each of the asserted trade secrets derived independent economic value from being secret given that the products were unique in the marketplace.

115.    Greater Oceans has also demonstrated that each of the asserted trade secrets was related to a product in interstate commerce.

116.    Greater Oceans has failed to establish theft of the secrets. Greater Oceans claims that the download of company emails is the basis of the alleged theft, but the mere download of the emails without more does not establish theft.

117.    Even if the download of the emails did establish theft, and therefore misappropriation, Greater Oceans has failed to show any damages from the theft. Greater Oceans has demonstrated how it was harmed by Thorstenson's self-dealing, but not how it was harmed by any alleged theft as it did not show that the secrets played any role in the self-dealing. Thorstenson sabotaged the Greater Oceans' contracts by going behind

1    Hornbaker's back to speak badly of Greater Oceans, not by doing anything related to

2    the downloaded secrets.

3    118.    Greater Oceans has also failed to establish breach of the duty of secrecy. Merely

4    downloading the emails (and by definition holding on to them) does not establish that

5    he breached any duty to keep them secret. Greater Oceans has not established that

6    Thorstenson failed to keep them secret.

7    119.    Greater Oceans fails to show the other means of misappropriation—namely use or

8    disclosure.

9    120.    Therefore, the misappropriation claim fails as to the ONO fins.

10   *Carbon/Composite Fins*

11   121.    Greater Oceans has demonstrated that the following constitute a trade secret: "█

12   ███████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████" Pl. Brief at 9.

14   122.    Greater Oceans has demonstrated that it took reasonable measures to maintain the

15   secrecy of the asserted trade secret. Ex. 111; July 11 at 71:16-73:16, 91:4-15.

16   123.    Greater Oceans has also demonstrated that each of the asserted trade secrets derived

17   independent economic value from being secret given that it was unique in the

18   marketplace.

19   124.    Greater Oceans has also demonstrated that each of the asserted trade secrets was

20   related to a product in interstate commerce.

21   125.    Greater Oceans has demonstrated that Thorstenson disclosed the trade secrets to Rock

22   West which used them in the development of the products in its Marine Division.

23   126.    Because Greater Oceans is not entitled to double recovery for the trade secret

24   misappropriation and the intentional interference with economic relations, the Court

25   only awards damages for the intentional interference with economic relations as

26   discussed below.

27   **C.    Greater Oceans' Second Claim for Conversion**

28

127.    To establish a claim for conversion, Greater Oceans must demonstrate the following: (1) ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 451 (1997); *see also* Judicial Council of California Civil Jury Instructions (CACI) No. 2100.

128.    Greater Oceans has established that it owned physical prototypes of a number of vest and fin products.

129.    Greater Oceans failed to establish the value of the physical prototypes, and therefore is not entitled to damages for the value of the prototypes themselves.

130.    Greater Oceans did not respond to the other arguments made by Thorstenson and therefore has conceded them. *See* Pl. Reb. Br.

131.    At best, Greater Oceans has established that Thorstenson is liable for conversion of the carbon fiber fin blades and that it was harmed because Thorstenson used the conversion to obtain the position with Rock West and develop its line of products for the marine division.

132.    Any damages for this appear to be identical to the misappropriation damages.

133.    Greater Oceans has failed to establish conversion of the electronic/paper documents relating to its product offerings, business concepts, and the aforementioned trade secrets. Not only has Greater Oceans failed to establish that Thorstenson was prohibited from retaining these documents by any agreement, Greater Oceans has failed to show any damages beyond what it might be entitled to for misappropriation of trade secrets with respect to the carbon fiber fin blades.

**D.    Greater Oceans' Third Claim for Breach of Contract**

134.    To establish a claim for breach of contract, Greater Oceans must demonstrate the following: (1) the existence of the contract; (2) a plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4) the resulting damages to the plaintiff. *Reichert v. General Ins. Co. of America*, 68 Cal. 2d 822, 830 (1968); CACI No. 303.

135.    Greater Oceans has failed to establish that there was a confidentiality agreement between the parties. The Consulting Agreement indicates an *intention* to execute a confidentiality agreement, but none was ever executed.

136.    Greater Oceans has failed to establish breach of any of the other agreements. Thorstenson's claims that he was entitled to be a co-owner of the business or entitled to be listed as an inventor may be contrary to the representations in some of these agreements but do not constitute *breaches* of these agreements.

137.    Similarly, allegedly stealing the safety vest prototype does not constitute a breach of the ownership assignment.

138.    To the extent that Thorstenson's failure to give timely notice (of 30 days) before terminating his independent consultant arrangement did constitute a breach, Greater Oceans has failed to establish any damages from this alleged breach.

139.    Therefore, the breach of contract claim fails.

**E.    Greater Oceans' Fourth Claim for Breach of Implied Covenant**

140.    To establish a claim for breach of implied covenant, Greater Oceans must demonstrate the following: (1) the existence of a contract; (2) the plaintiff did all, or substantially all, of the significant things the contract required; (3) any conditions required for the defendant's performance had occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683–84 (1988); *San Jose Production Credit Ass'n v. Old Republic Life Ins. Co.*, 723 F.2d 700, 703 (9th Cir. 1984).

141.    The breach of implied covenant fails for the same reasons that the breach of contract claim fails.

**F.    Greater Oceans' Fifth and Sixth Claims for Breach of the Duty of Loyalty and Breach of Fiduciary Duty**

142.    Greater Oceans explained that it asserted these claims in the event that the Court finds that Thorstenson was part-owner of Greater Oceans.

143. The Court need not address these as it finds that Thorstenson was an independent consultant and not a co-owner of Greater Oceans.

**G.    Greater Oceans' Seventh and Eighth Claims for Tortious Interference with Contractual Relations and Intentional Interference with Prospective Economic Advantage**

144. To establish a claim for tortious interference with contractual relations, Greater Oceans must establish the following: (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *CRST Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1105 (9th Cir. 2007); CACI No. 2201.

145. The elements of interference with prospective economic advantage resemble those of intentional interference with contractual relations, except that in place of a contractual relationship between the plaintiff and third party, the issue is whether there is an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff.

146. Greater Oceans has established that it entered into contractual and/or economic relationships with its clients, vendors, and suppliers, namely Capewell, QBAS, Rock West, and Cathay.

147. Greater Oceans did not reply to the Thorstenson's argument that there was not a contractual relationship with Rock West, Quicksilver, or Capewell, so it appears that it has conceded that there was no contractual relationship. *See* Pl. Reb. Br.

148. In fact, the language Greater Oceans used with respect to each of these suggests something short of a contractual agreement. *See* Pl. Brief at 22 ("Rock West . . . promised to move forward"; "Quicksilver . . . agreed to work with"; "Capewell  . . . was interested in ordering").

/ / /

*Cathay*

149. Greater Oceans established that it had a contractual and economic relationship with Cathay as a supplier.

150. Greater Oceans established that it ordered a total of 322 vests from Cathay.

151. Greater Oceans has established that it would realize future economic benefit as result of its relationship with Cathay because the vest Cathay was producing was a unique product for Greater Oceans that no other competitor had on the market yet, and Thorstenson and Greater Oceans anticipated Greater Oceans distributing these vests through Capewell and Quicksilver.

152. Greater Oceans has established that Thorstenson knew of this contractual and economic relationship by virtue of his communications with Cathay.

153. Greater Oceans established that Thorstenson canceled the two vest orders without authorization for his own purposes.

154. Greater Oceans has established that Thorstenson intended to disrupt this contractual and economic relationship by speaking poorly of Hornbaker and Greater Oceans, and directing Cathay to produce the vests for Thorstenson so that he could work with Cathay independently on the same vest that Greater Oceans contemplated with Cathay.

155. Greater Oceans has established that Thorstenson breached and/or disrupted its relationship with these third parties by—at the very least—causing the cancellation of the order of the 322 vests.

156. Greater Oceans has established that the anticipated profit from 300 vests was $100,000.

157. Therefore, Greater Oceans has established that it suffered damages in the amount of $107,332.26 as a result of the cancellation of the order of 322 vests.[5]

---

[5] Anticipated profit from one vest: $100,000 / 300 = $333.33.

Anticipated profit from 322 vests: $333.33 x 322 = $107,332.26

158. Greater Oceans has not established any additional damages related to Cathay by a preponderance of the evidence.

### QBAS – Masks and Goggles

159. Greater Oceans established that it had a contractual and economic relationship with QBAS as a supplier.

160. Greater Oceans established that it had ordered masks and goggles from QBAS.

161. Greater Oceans has established that it would realize future economic benefit as result of its relationship with QBAS because the masks and goggles QBAS was developing for Greater Oceans were unique products for Greater Oceans that no other competitor had on the market yet, and Thorstenson and Greater Oceans anticipated Greater Oceans distributing these masks and goggles through Quicksilver.

162. Greater Oceans has established that Thorstenson knew of this contractual and economic relationship by virtue of his communications with QBAS.

163. Greater Oceans has established that Thorstenson intended to disrupt this contractual and economic relationship by speaking poorly of Hornbaker and Greater Oceans, and directing QBAS to work directly with him instead on the same masks and goggles that Greater Oceans contemplated with QBAS.

164. Greater Oceans has established that Thorstenson breached and/or disrupted its relationship with QBAS by speaking poorly of Greater Oceans to QBAS, causing QBAS to cease working with Greater Oceans to produce the masks and goggles.

165. Greater Oceans has failed to establish the amount of the anticipated profit from the masks and goggles and, therefore, its damages. The only testimony on this was from Bob McKnight who testified that the entire Third Eye program (including the vests and fins, in addition to the masks and goggles) would be $4-5M. July 10 at 122:22 – 123:5. McKnight described the numbers as "loose numbers," July 10 at 123:20 – 124:5, and Greater Oceans did not establish what portion of the $4-5M would be *profit* to Greater Oceans.

166.    Therefore, Greater Oceans cannot recover for the breach with respect to the QBAS masks and goggles.

**QBAS – ONO Fins**

167.    Greater Oceans established that it had a contractual and economic relationship with QBAS as a supplier.

168.    Greater Oceans established that it had intended to order ONO fins from QBAS. Ex. 134.

169.    Greater Oceans has established that it would realize future economic benefit as result of its relationship with QBAS because the ONO fins QBAS was developing for Greater Oceans were unique products for Greater Oceans that no other competitor had on the market yet, and Thorstenson and Greater Oceans anticipated Greater Oceans distributing these ONO fins through Quicksilver.

170.    Greater Oceans has established that Thorstenson knew of this contractual and economic relationship by virtue of his communications with QBAS.

171.    Greater Oceans has established that Thorstenson intended to disrupt this contractual and economic relationship by speaking poorly of Hornbaker and Greater Oceans, and directing QBAS to work directly with him instead on the same ONO fins that Greater Oceans contemplated with QBAS.

172.    Greater Oceans has established that Thorstenson breached and/or disrupted its relationship with these QBAS by speaking poorly of Greater Oceans to QBAS, causing QBAS to cease working with Greater Oceans to produce the ONO fins.

173.    Greater Oceans has failed to establish the anticipated profit from the ONO fins. The only evidence on this was Hornbaker's testimony that Thorstenson estimated $2M in profit, July 11 at 96:16-19, which was not corroborated or supported by anything, and which appeared to the Court to be a very loose number. Similarly, Greater Oceans relied on Exhibit 69—a business proposal with no numbers. Finally, Greater Oceans relied on Exhibit 464—a text message exchange which contains numbers that Thorstenson described as his "SWAG," which the Court understands to mean

"Scientific Wild Ass Guess."[6] These numbers are simply too speculative for the Court to find these damages by a preponderance of the evidence.

174.    Therefore, Greater Oceans cannot recover for the breach with respect to the QBAS ONO fins.

*Rock West*

175.    Greater Oceans established that it had an economic relationship with Rock West as a supplier of carbon/composite fins.

176.    Greater Oceans established that it had ordered carbon/composite fins. Ex. 52.

177.    Greater Oceans has established that it would realize future economic benefit as result of its relationship with Rock West because the carbon/composite fins Greater Oceans was developing with Rock West were unique products for Greater Oceans that no other competitor had on the market yet, and Thorstenson and Greater Oceans anticipated Greater Oceans distributing these carbon/composite fins through Quicksilver.

178.    Greater Oceans has established that Thorstenson knew of this contractual and economic relationship by virtue of his communications with Rock West.

179.    Greater Oceans has established that Thorstenson intended to disrupt this contractual and economic relationship by speaking poorly of Hornbaker and Greater Oceans, and directing Rock West to work directly with him instead on the same carbon/composite fins that Greater Oceans contemplated with Rock West.

180.    Greater Oceans has established that Thorstenson breached and/or disrupted its relationship with these third parties by speaking poorly of Greater Oceans to Rock West, causing Rock West to cease working with Greater Oceans to produce the carbon/composite fins.

---

[6] "Scientific Wild Ass Guess," or "SWAG," is an American English slang term meaning "a rough estimate made by an expert in the field, based on experience and intuition." *Wikipedia*, https://en.wikipedia.org/wiki/Scientific_wild-ass_guess (last visited Jul. 26, 2024), https://perma.cc/E7FM-GPYC.

181.    Greater Oceans seeks $6M in damages on the basis that while Thorstenson was working with Greater Oceans, he estimated that sales of the carbon fins would be $6M. But the evidence shows that the $6M figure was an "educated stab" and the Court finds it is too speculative to establish damages by a preponderance of the evidence. *See* Ex. 52 at ET 34106 ("The below forecasting is an *educated stab* based on discussions with OMER sales personnel, local spearfishing experts, and internet research." (emphasis added)).

182.    Greater Oceans did, however, establish that Rock West was able to sell 500 fins using the Greater Oceans concepts.

183.    Greater Oceans has established that the anticipated average price was $300 per fin and the profit margin was 30%. Ex. 52 at ET 34108.

184.    Therefore, Greater Oceans has only established damages of $45,000.[7]

**QuikSilver**

185.     Although Greater Oceans appears to have established liability with respect to Quiksilver (for the reasons stated above), Greater Oceans has not established damages with respect to the masks, goggles, or the ONO fins (for the reasons also stated above). Greater Oceans is not entitled to any additional recovery with respect to the carbon/composite fins.

186.    Therefore, Greater Oceans cannot recover for the breach with respect to Quiksilver.

**Capewell**

187.    Although Greater Oceans appears to have established liability with respect to Capewell (for the reasons stated above), Greater Oceans has not established damages beyond those captured above in the $107,332.26 as a result of the cancellation of the order of 322 vests.

---

[7] Profit per fin: $300 x 30% = $90

Profit for 500 fins: $90 x 500 = $45,000

**H.**     **Greater Oceans' Ninth Claim for Unfair Competition in Violation of <u>Cal. Bus. & Prof. Code § 17200</u> *et seq.***

188.     <u>Cal. Bus. & Prof. Code § 17200</u> prohibits any business act or practice that is "unlawful, unfair, or fraudulent." *Lippitt v. Raymond James Financial Services, Inc.*, <u>340 F.3d 1033, 1043</u> (9th Cir. 2003). Unlawful conduct is defined as "anything that can properly be called a business practice and that at the same time is forbidden by law." *Chabner v. United of Omaha Life Ins. Co.*, <u>225 F.3d 1042, 1048</u> (9th Cir. 2000) (internal citations omitted). Unfair conduct is "any practice whose harm to the victim outweighs its benefits." *Lippitt*, <u>340 F.3d at 1043</u> (internal citations omitted). Fraudulent conduct only requires a showing that members of the public are likely to be deceived. *Id.*

189.     Greater Oceans has established that Thorstenson engaged in unlawful conduct by his violation of the Defend Trade Secrets Act, in addition to the common law causes of action as described above.

190.     As a result, Greater Oceans has also established that Thorstenson violated the California Business & Professions Code. Greater Oceans is not entitled to any additional recovery as that would constitute double recovery.

**I.**     **Greater Oceans' Tenth Claim for Declaratory Judgment Under Cal. Code Civ. Proc. § 1060**

191.     To qualify for declaratory relief under Section 1060, Greater Oceans is required to establish: (1) a proper subject of declaratory relief; and (2) an actual controversy involving justiciable questions relating to the rights or obligations of a party. *Lee v. Silveira*, <u>6 Cal. App. 5th 527, 546</u> (2016).

192.     Greater Oceans has established that the issue of whether Thorstenson is entitled to payment for invoices created after he terminated the Consulting Agreement is a proper subject of declaratory relief.

193.     Greater Oceans has established that an actual controversy exists regarding that issue, as the parties disagree over whether Thorstenson's invoices were timely submitted.

194. As discussed below with respect to Thorstenson's claim for Breach of Contract, Greater Oceans is not obligated to pay Thorstenson for his November 2020 invoices because they were untimely pursuant to the Consulting Agreement.

**J.    Thorstenson's First Counterclaim for Fraud**

195. To succeed on his counterclaim for fraud, Thorstenson must prove the following elements: a) misrepresentation (false representation, concealment or nondisclosure), b) knowledge of falsity, c) intent to defraud, *i.e.*, to induce reliance, d) justifiable reliance on the part of the Thorstenson, and e) resulting damages. *Charpentier v. Los Angeles Rams Football Club Co., Inc.*, 75 Cal. App. 4th 301, 312 (1999).

196. Thorstenson alleges that Hornbaker made the following two misrepresentations: "That Mr. Thorstenson would be an equal owner in Plaintiff after his divorce proceedings were final, and after he assigned his patent rights in the safety vest to Plaintiff." Def. Brief at 27 (citing Exh. 232 at 3; July 10 at 73:21-22,194:3-22, 199:12-14).

197. Thorstenson has not established these misrepresentations.

198. To the contrary, the evidence established that *Thorstenson* wanted the independent contractor arrangement to avoid his wife recovering part of Greater Oceans. This is corroborated by the misleading presentation of his income in the divorce proceeding documents.

199. Similarly, the evidence established that Thorstenson was well aware of the ownership of the IP and was not induced or forced to relinquish ownership of the IP, much less deceived into doing so.

200. Therefore, Thorstenson's counterclaim for fraud fails.

**K.    Thorstenson's Second Counterclaim for Negligent Misrepresentation**

201. To succeed on his counterclaim for negligent misrepresentation, Thorstenson must prove the following elements: a) the misrepresentation of a past or existing material fact; b) without reasonable ground for believing it to be true; c) with intent to induce another's reliance on the fact misrepresented; d) justifiable reliance on the misrepresentation; and e) resulting damage. *Dent v. National Football League*, 902

F.3d 1109, 1123 (9th Cir. 2018) (citations omitted). Negligent misrepresentation demands a positive assertion, not merely a misleading omission. *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 243 (2007).

202. Thorstenson alleges that Hornbaker made same two misrepresentations as set forth above with respect to the counterclaim for fraud, namely that Thorstenson would become a co-owner of Greater Oceans once his divorce was final and once he assigned his intellectual property to Greater Oceans. Def. Brief at 30.

203. Just as with the counterclaim for fraud, Thorstenson has not established these misrepresentations.

204. To the contrary, the evidence established that *Thorstenson* wanted the independent contractor arrangement to avoid his wife recovering part of Greater Oceans. This is corroborated by the misleading presentation of his income in the divorce documents.

205. Similarly, the evidence established that Thorstenson was well aware of the ownership of the IP and was not induced or forced to relinquish ownership of the IP, much less deceived into doing so.

206. Therefore, Thorstenson's counterclaim for negligent misrepresentation fails.

**L.    Thorstenson's Third Counterclaim for Breach of Contract**

207. To succeed on its claim for breach of contract under California law, Thorstenson must prove: a) the existence of a contract; b) Thorstenson's performance or excuse for nonperformance; c) Greater Oceans' breach; and d) resulting damages to Thorstenson. *Reichert*, 68 Cal. 2d at 830 (1968)

208. Thorstenson has established the existence of a contract, namely the Consulting Agreement. Ex. 3.

209. The contract required that Thorstenson timely submit his invoices in order to receive payment. Ex. 3, ¶ 5(b). He admitted that he submitted them eight months after ending his relationship with Greater Oceans. He has therefore failed to establish that he timely submitted the disputed invoices and, as a result, has failed to establish a breach by the nonpayment of those invoices.

210. Thorstenson has not established that Greater Oceans breached the aforementioned Agreements.

211. Thorstenson has not suffered any damages because there was no breach.

**M.    Thorstenson's Fourth Counterclaim for Common Count for Service Performed**

212. To succeed on his counterclaim for Common Count for the reasonable value of services performed, Thorstenson must prove the following elements: a) Thorstenson performed certain services for the Greater Oceans; b) the reasonable value of those services; c) the services were rendered at the request of Greater Oceans; and d) the services were unpaid. *Haggerty v. Warner*, 115 Cal.App.2d 468, 475 (Cal. Ct. App. 1953).

213. Thorstenson has established that he performed work for Greater Oceans at the request of Greater Oceans.

214. The judicial estoppel defense does not apply as Thorstenson has established that no court accepted his representations of $3500 in income given that his divorce proceedings were resolved via a settlement rather than a judicial finding.

215. Greater Oceans has asserted that the unclean hands defense applies because: (1) Thorstenson falsely asserted that he was part owner of Greater Oceans; (2) Thorstenson is now seeking ownership in the products and information he stole; and (3) Thorstenson fabricated and backdated invoices. Pl. Brief 26-27.

216. With respect to the first argument, as discussed above, Thorstenson has not asserted that he was a part owner in this proceeding.

217. With respect to the second argument, any ownership Thorstenson is seeking in ownership of products and information is unrelated to this common count claim. As Greater Oceans acknowledges, the question is whether Thorstenson dirtied his hands in acquiring the common cause right (he did not) or the manner of dirtying renders inequitable the assertion of the common cause right (Greater Oceans has not established that it has or how it could). Simply using improperly downloaded emails to prepare invoices, Pl. Reb. Br. 8-9, does not suffice.

218. Finally, with respect to the third argument, Greater Oceans has not pointed to specific invoices that were fabricated, and cannot therefore show that Thorstenson is not entitled to any payment.

219. However, Thorstenson still bears the burden of establishing damages in the amount sought. As discussed above, the Court found Thorstenson to not be credible with respect to many aspects of his testimony. In addition, Thorstenson admitted to preparing and sending the invoices eight months after quitting Greater Oceans despite the 30-day invoicing requirement. The Court finds—based in large part upon his demeanor and internal inconsistencies and improbability of his testimony—that he testified untruthfully when he claimed to be unaware of the 30-day requirement, July 10 at 80:23-25, and then later claimed it was only "for convenience" (and apparently did not have to be followed). July 10 at 81:1-5. Furthermore, the body of evidence and Thorstenson's demeanor while testifying demonstrates that Thorstenson was extremely angry about what he believed to be a betrayal by Hornbaker and was intent on getting back at him. The Court finds that it is more likely than not that Thorstenson padded the invoices given how he was untruthful about a number of matters.[8] He demonstrated that he did not act with integrity with respect to Greater Oceans, and the Court therefore finds that he has did not incur invoices in the amount he now seeks.

220. Thorstenson has established that he incurred $1500 for one month's work (June 2019).

221. In light of his credibility issues, Thorstenson has failed to establish that he incurred any amount for the month of April 2020 (after he allegedly learned he was no longer going to be a part-owner of Greater Oceans). The only work that there is extrinsic evidence for are email correspondence with companies that Thorstenson was apparently trying to cultivate as his own business relationships and therefore not properly considered consulting for Greater Oceans.

---

[8] To the extent that Thorstenson attempts to portray himself as an unsophisticated business person who was deceived by the savvier Hornbaker, this is belied by the bulk of the evidence in the case, including his admission that he apparently knowingly used a business trip with his prior employer (Aqua Lung) to secretly explore business opportunities for himself. See Ex. 159; July 10 at 33:15-34:6, 34:19-24, 200:5-20.

222.  Because Thorstenson has established that he incurred $1500 for one month's work (June 2019), the Court will award $1500 per month for the remaining months sought (January 2019 – April 2020), with the exception of June 2019 (because it was already paid) and April 2020 (because the Court finds that nothing was incurred).

223.  Therefore, Thorstenson is entitled to $21,000 on this claim.

**N.     Thorstenson's Fifth Cause of Action for Violation of <u>California Business & Professions Code § 17200</u>**

224.  To succeed on his counterclaim for violation of the fraud prong of <u>California Bus & Prof Code § 17200</u>, Thorstenson must prove the following elements: 1) Greater Oceans' (a) affirmative misrepresentation, conduct, or business practice; or (b) omission in violation of a duty of the Thorstenson to disclose; and (2) that is likely to have deceived members of the public. Bus. & Prof. Code § 17200; *Morgan v. AT & T Wireless Services, Inc.*, <u>177 Cal. App. 4th 1235, 1256</u> (2009). Thorstenson failed to identify a specific "unlawful, unfair, or fraudulent" business practice that Greater Oceans engaged in.

225.  Thorstensen alleges that Hornbaker misrepresented who was an inventor on the patent applications at issue.

226.  Thorstenson has failed to establish, given Hornbaker's testimony about his role in the designs and given the IP assignments, that there has been any misrepresentation to the USPTO.

227.  Therefore, this claim fails.

**V.     <u>CONCLUSION</u>**

For the foregoing reasons, the Court ORDERS as follows:

1.  The following claims made by Greater Oceans fail and Greater Oceans will not recover any damages on them:

    a.  First Cause of Action for Misappropriation of Trade Secrets with respect to the safety vest, the low volume mask, the amphibious goggles, and the ONO fins only;

b.   Third Cause of Action for Breach of Contract;

c.   Fourth Cause of Action for Breach of Implied Covenant;

d.   Fifth and Sixth Causes of Action for Breach of Duty of Loyalty and Breach of Fiduciary Duty (given that these were only pleaded in the alternative and the Court did not find the requisite antecedent); and

e.   Seventh and Eighth Causes of Action for Tortious Interference with Contractual Relations and Intentional Interference with Prospective Economic Advantage with respect to QBAS and Quiksilver only.

2.   The following claims made by Greater Oceans succeed with the following damages:

a.   First Cause of Action for Misappropriation of Trade Secrets with respect to the carbon/composite fins with no additional recovery besides that set forth below for the Seventh and Eighth Causes of Action;

b.   Second Cause of Action for Conversion with no additional recovery besides that set forth above for the First Cause of Action;

c.   Seventh and Eighth Causes of Action for Tortious Interference with Contractual Relations and Intentional Interference with Prospective Economic Advantage with respect to Cathay in the amount of $107,332.26; RockWest in the amount of $45,000; and Capewell with no additional recovery beyond that for Cathay.

d.   Ninth Cause of Action for Violation of Section 17200 with no additional recovery beyond that set forth above; and

e.   Tenth Cause of Action for Declaratory Judgment as set forth in the relevant section of the Conclusions of Law above.

3.   The following counterclaims made by Thorstenson fail and Thorstenson will not recover any damages on them:

a.   First Counterclaim for Fraud;

b.   Second Counterclaim for Negligent Misrepresentation;

c.   Third Counterclaim for Breach of Contract; and

        d.   Fifth Counterclaim for Violation of Section 17200.

4.   The following counterclaim made by Thorstenson succeeds with the following damages:

        a.   Fourth Counterclaim for Common Count in the amount of $12,000.

5.   Greater Oceans' net recovery is therefore $131,332.26.[9]

6.   To the extent that either party is entitled to attorney's fees and/or costs, the parties are ORDERED to meet and confer and submit a joint briefing schedule for this.

7.   The parties shall meet and confer regarding what portions (if any) of this Order need be sealed, and shall file a joint statement describing as such within fourteen (14) days of this Order. The Joint Statement shall include all detail required for a motion to seal under the local rules (e.g., the parties must justify why the information they seek to seal warrants sealing, and must file a declaration in support). The Joint Statement shall also include as an attachment a version of this Order with proposed redacted language highlighted in yellow, pursuant to Local Rule 79.5.2.2. That attachment may be filed under seal. The parties shall also email to chambers a PDF with redactions in black for the Court to file in the event that the redactions are approved. This Order shall be conditionally sealed in its entirety in the interim.

IT IS SO ORDERED.

Dated: August 13, 2024

                                   MAAME EWUSI-MENSAH FRIMPONG

                                     United States District Judge

---

[9] $107,332.26 + $45,000 - $21,000 = $131,332.26.